James TRAFICANT, Jr.,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE SERVICE,
Respondent–Appellee.

No. 88–1271.

United States Court of Appeals,
Sixth Circuit.

Argued July 24, 1989.

Decided Aug. 29, 1989.

James A. Traficant, Jr., Poland, Mich., pro se.

Matthew T. Fekete (argued), Youngstown, Ohio, for petitioner-appellant.

Gary R. Allen, Acting Chief, Ann Belanger Durney, Linda E. Mosakowski, U.S. Dept. of Justice, Tax Div., Charles E. Brookhart (argued), Tax Div., Dept. of Justice, Washington, D.C., for C.I.R.

Before MERRITT and NELSON, Circuit Judges, and BROWN, Senior Circuit Judge.

MERRITT, Circuit Judge.

James A. Traficant, Jr., formerly Sheriff in and now a member of Congress from Youngstown, Ohio, appeals on several grounds from the ruling of the Tax Court that he failed to report $108,000 in bribes on his 1980 income tax return, and that the underpayment was due to fraud within the meaning of 26 U.S.C. § 6653(b).[1] 89 T.C. 501 (1987), [1987 Transfer Binder] Tax Ct. Rep. (CCH) No. 44,180 (1981). The gravamen of the fraud ruling was that Traficant took $108,000 in bribes from two competing factions of organized crime during his campaign for sheriff of Mahoning County, Ohio, knowing that bribes are taxable income, and that he nevertheless failed to report this income in an effort to evade tax.

Traficant raises several issues on appeal: 1) Traficant's prior acquittal on criminal charges arising from the same conduct precludes the Tax Court from finding that he took bribes; 2) the evidence of his receipt of income and of fraud is insufficient to uphold the judgment against him; 3) the Tax Court committed reversible error in several procedural rulings; and 4) the Tax Court judge's denial of Traficant's motion for recusal was an abuse of discretion. Of all these issues, only one of the procedural matters has any merit, and we conclude that the error committed there was harm-less. Accordingly, we affirm the judgment of the Tax Court.

## FACTUAL AND PROCEDURAL HISTORY

The Tax Court made extended findings of fact, which we summarize here. During 1979 and 1980, two subgroups of La Cosa Nostra both competed and cooperated to control organized crime activities in the Mahoning Valley, an area between Cleveland, Ohio and Pittsburgh, Pennsylvania that includes Mahoning County, Ohio. The so-called Cleveland Faction was based in Cleveland and headed by Charles, Orlando and Ronald Carabbia; the Pittsburgh Faction was based in Pittsburgh and headed by James Prato and Joseph Naples. The rivalry of these crime families was carried on during the period, starting in September 1979, in which Traficant pursued his campaign for sheriff of Mahoning County. In November, 1980, Traficant won the general election.

As part of his fund-raising effort, Traficant sold tickets to various campaign events. He started selling tickets through the Carabbias in January 1980. Several cash deliveries from the Carabbias were received but never reported in Traficant's campaign financial reports. At one point Charles Carabbia introduced Traficant to Prato, who subsequently gave Traficant $15,000 in cash saying, "I want you to be my friend." Traficant did not report receipt of this sum either. Thereafter Prato began selling tickets for Traficant, and delivering large sums to Traficant's campaign. Again, these transactions went unreported on campaign financial reports required by the state. Just before the general election in November 1980, Traficant told Prato he wanted $100,000 in "good faith money": Prato gave him $25,000. Of the total $60,000 Traficant received from Prato, Traficant gave $55,000 to the Carab-

---

1. Section 6653 defines certain "Additions to tax for negligence and fraud." The pertinent subsection reads as follows:

   If any part of any underpayment (as defined in subsection (c)) [of this section] of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.

   26 U.S.C. § 6653(b)(1).

bias in exchange for $55,000 in laundered funds from the Carabbias.

After the election the Carabbias became worried that Traficant had accepted so much money from the Pittsburgh Faction that his loyalty to the Cleveland Faction was eroding. The Carrabias made tapes of two conversations they had with Traficant and some of his campaign aides. Gov't Ex. C and D, JA 134, 164. On the first of these, which apparently took place one week after Traficant won the general election for sheriff, Traficant emphasized that he would remain loyal to the Carabbias and would use his position to assist the Cleveland Faction in its effort to control its share of the organized crime activities in the Mahoning Valley. The tape also reveals that Traficant proposed that he would respond to public accusations that he had accepted bribes from organized crime by arresting leaders of the Pittsburgh Faction on charges of attempting to bribe him and crediting the Carabbias with helping him to make the arrest. The Tax Court found that Traficant hesitated to adopt this plan because it would backfire if his true relationship to the Carabbias became known. In the second recorded conversation, as the Tax Court found, the Carabbias stated that they had told a member of the Pittsburgh Faction that Traficant had accepted bribes from the Cleveland Faction and would support the latter. Traficant expressed concern that this disclosure scotched his plan to arrest Pittsburgh Faction members as a way of demonstrating his own innocence.

The FBI discovered these tapes in the course of another investigation and soon interviewed Traficant. Robert G. Kroner, one of the agents who conducted that interview, testified that Traficant first denied knowing the Carabbias, Prato or Naples; denied ever having met with them; and denied ever having accepted money from any of them. The agents then played the first tape and told Traficant that they would seek to obtain immunity for him if he would cooperate with them in investigating allegations that he had accepted bribes from organized crime figures. Traficant said he would cooperate, and then an agent prepared a statement based on his knowl-

edge of the contents of the tape and offered it to Traficant to sign. After stating at first that he would not sign the statement because it was not true, Traficant agreed to sign it upon Kroner's offer to play the second tape. R. 77 at 421–25, JA 380–81. The statement that Traficant signed reads as follows:

I, James Traficant, make the following free and voluntary statement to Robert G. Kroner Jr. and Mark S. Swanger, Jr. who have identified themselves to me as Special Agents of the Federal Bureau of Investigation. I realize, and fully understand, that I do not have to make this statement, and that it could be used against me at a later time. During the period that I campaigned for Sheriffe [sic] of Mahoning County, Ohio, I accepted money from Orlando Carabbia, Charles Carabbia, Joseph Naples and James Prato. This money was given to me with the understanding that certain illegal activities would be allowed to take place in Mahoning County after my election, and as Sheriffe [sic], I would not interfere with those activities. I have read this statement, consisting of this page, and it is true and correct.

Gov't Ex. E, JA 167.

The cooperative spirit that allied Traficant and the FBI waned and eventually disappeared when officials refused to accept several conditions Traficant placed on his continued cooperation. R. 77 at 431. Traficant was indicted of accepting bribes in violation of RICO, 18 U.S.C. § 1961 et seq., and of filing a false income tax return in violation of 26 U.S.C. § 7206(1). He acted as his own lawyer at the trial, and a jury acquitted him of both charges in the spring of 1983.

This tax proceeding was commenced by a petition filed November 5, 1984. After an adversary hearing the Tax Court found that Traficant had accepted $108,000 in bribes from the two crime families, that he knew this entire sum was taxable income, that he had failed to report this income on his 1980 income tax return, that he had therefore underpaid his income tax for that year, and that his failure to report this

income was fraud within the meaning of § 6653(b).

## ISSUE PRECLUSION AND DOUBLE JEOPARDY

■ Traficant argues on appeal, as he did before the Tax Court, that his acquittal of the criminal charges precludes the Tax Court in this civil proceeding from finding that he accepted the bribes alleged in both proceedings. The Tax Court held that the issue was not precluded because the criminal verdict signifies a finding "only that reasonable doubt existed that the accused was guilty of the offenses charged." 89 T.C. at 511, n. 9, Tax Ct.Rep. (CCH), No. 44,180 at 3598, n. 9. The Tax Court was entirely correct.

The leading case is *Helvering v. Mitchell*, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938), a case remarkably on point. Mitchell had been acquitted of charges brought under a criminal tax evasion provision of the Revenue Act of 1928. He then resisted a penalty for tax fraud authorized by the tax-fraud penalty provision of the same Act on grounds of double jeopardy and issue preclusion. The Supreme Court, in a unanimous decision written by Justice Brandeis, rejected both arguments. As to issue preclusion it said:

> The difference in degree of the burden of proof in criminal and civil cases precludes application of the doctrine of *res judicata*. The acquittal was "merely ... an adjudication that the proof was not sufficient to overcome all reasonable doubt of the guilt of the accused." It did not determine that Mitchell had not willfully attempted to evade the tax.

*Id.* at 397, 58 S.Ct. at 632 (quoting *Lewis v. Frick*, 233 U.S. 291, 302, 34 S.Ct. 488, 492, 58 L.Ed. 967 (1914)) (ellipsis in original).

Nothing Traficant argues before us takes his case outside the clear rule of *Helvering v. Mitchell*. In particular, he argues that a jury instruction in his criminal trial—requiring the jury to determine whether Traficant had failed to report bribes only if it found that he had accepted bribes—requires us to consider his acquittal as a finding that he did not accept bribes. The jury was also given a reasonable doubt instruction. It is the latter instruction, not the former, that imposes a legal meaning on his acquittal, and that meaning is simple: it has not been proven beyond a reasonable doubt that Traficant took bribes from La Cosa Nostra.

Next, Traficant argues that his case falls within an exception to the rule of *Helvering v. Mitchell*. That such exceptions exist is clear, *McKeehan v. United States*, 438 F.2d 739, 745 n. 7 (6th Cir.1971), but Traficant is unable to show us any precedent for one that would apply to his case.

■ The *McKeehan* Court referred to *Coffey v. United States*, 116 U.S. 436, 6 S.Ct. 437, 29 L.Ed. 684 (1886), in which the Supreme Court held that an acquittal bars subsequent *in rem* proceedings predicated on the same statutory prohibition and the same alleged acts. First we note that no such statutory overlap appears in our case. Second, *Coffey* has been largely rejected since we referred to it in *McKeehan*. Specifically disapproving of *Coffey*, the Supreme Court has "clarif[ied] that neither collateral estoppel nor double jeopardy bars a civil, remedial forfeiture proceeding initiated following an acquittal on related criminal charges." *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361, 104 S.Ct. 1099, 1104, 79 L.Ed.2d 361 (1984). And third, *Coffey* has been forcefully distinguished from cases in which the Government undertakes subsequent civil proceedings not in order to punish the same conduct alleged but not proven in the prior criminal trial, but rather in order to assert its interest in property retained by the defendant. *Stone v. United States*, 167 U.S. 178, 186–191, 17 S.Ct. 778, 781–783, 42 L.Ed. 127 (1897). Traficant attempts to characterize the tax-court proceedings against him as reflecting a determination by the Government that, what it could not get a jury to punish in the criminal prosecution, it would punish under the tax laws, and points to the following language in *Helvering v. Mitchell:*

> Where the objective of the subsequent action likewise [*i.e.*, as in the criminal proceeding] is punishment, the acquittal

is a bar, because to entertain the second proceeding for punishment would subject the defendant to double jeopardy.... 303 U.S. at 398, 58 S.Ct. at 632. In raising this objection, Traficant must aim not at the tax-deficiency count, which clearly aims not to punish him but to force him to pay taxes due and owing, but to the tax-fraud count brought pursuant to § 6653(b). But in *Helvering v. Mitchell* the Supreme Court specifically held that the civil tax fraud penalty is not punitive in nature but is rather a remedial statute adopted "primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *Id.* at 401, 58 S.Ct. at 634. On that ground it rejected the double jeopardy objection, and on that ground we must do the same.

## SUFFICIENCY OF THE EVIDENCE

Traficant argues that the Government failed to introduce evidence sufficient to support the judgment against him. The deficiency and the fraud counts must be analyzed separately because they involve different burdens of proof.

■ *Evidence of Tax Deficiency.* Money or property is taxable income includable in a taxpayer's gross income when the taxpayer receives the money or property with no obligation to repay and with no restrictions as to its disposition. *James v. United States,* 366 U.S. 213, 219, 81 S.Ct. 1052, 1055, 6 L.Ed.2d 246 (1961) (plurality opinion). A notice of deficiency stating the amount of income on which a taxpayer has failed to pay tax is presumed to be correct, so that the taxpayer bears the burden of production *and* the burden of proof as to an error in the notice. *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); Rule 142(a), Rules of Practice and Procedure of the United States Tax Court, 26 U.S.C. foll. § 7453. Findings by the Tax Court as to the correctness of the IRS's assessment of taxable income are reversible only if clearly erroneous. *See* 26 U.S.C. § 7482(a)(1) (courts of appeals have jurisdiction to review decisions of Tax

Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury"); Fed.R. Civ.P. 52(a) (in actions tried in district court without a jury, district court's findings of fact "shall not be set aside unless clearly erroneous"); *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960) (Fed.R.Civ.P. 52(a) invoked by § 7482(a)).

In this case, the IRS notified Traficant that he had unreported income of $163,000. The Tax Court, however, found that Traficant was right when he asserted that the IRS had counted one payment of $55,000 twice: first when it was given to Traficant by Prato, and again when Traficant exchanged it with the Carabbias for other monetary instruments of the same value. The Tax Court found, however, that the remaining $108,000 in income stated on the notice of deficiency had in fact accrued to Traficant as income. It is this finding that Traficant attacks on appeal.

Traficant argues that the only evidence before the Tax Court as to the pivotal sum in the case—his apparent admission that he had taken $103,000 from the Carabbias—is one of the two surreptitiously recorded conversations he held with the Carabbias, and that he has a perfectly innocent explanation of the conversation that should have been accepted. His version of his relations to the two crime factions is that he began dealing with them believing them to be legitimate players in local politics; that he then believed they were selling tickets for him in the way of legitimate fundraising; that when he discovered their true colors he could not withdraw from his dealings with them without risking violent retaliation; and that he then adopted a merely prudent course of convincing each faction that he was cooperating with it and of bluffing them into thinking he had made commitments to them when in fact he had not. He represents the $103,000 he mentions on the tape as a merely fictitious figure which he threw out for the Carabbias to use in their effort to intimidate the other faction. Aside from this apparent admission, Traficant asserts in his brief,

the record is devoid of proof that he took $103,000 or any other bribes. No financial analysis of his net worth or of his personal transactions was introduced.

Traficant's sufficiency argument fails. On the first tape Traficant admitted receiving $60,000 from Prato and admitted receiving an unspecified sum from the Carabbias; on the second tape he admitted receiving $103,000 from the Carabbias. These two sums yield the $163,000 originally specified on the notice of deficiency. From that figure the Tax Court correctly subtracted the laundered $55,000. The Government adduced ample evidence that supports the Tax Court's conclusion that the remaining $103,000 came to him not, as Traficant asserts, as legitimate campaign contributions but rather as bribe income. For example, many deliveries of cash from the Carabbias to Traficant were never tied to legitimate ticket sales: indeed, Traficant's aide testified that he did not even count some cash deliveries. R. 78 at 632, 640. There is specific testimony that deliveries of cash from the Carabbias were diverted from the campaign's established accounting procedures. R. 77 at 350–51. Like the Tax Court, we see no indication on Traficant's state election campaign reports that he reported income received from the Carabbias. And finally, we note the credibility problem Traficant has created by presenting several inconsistent explanations of his conduct. His signed statement admits that he took bribes in exchange for promises not to interfere with organized crime. He testified, however, that he took cash in order to prevent crime figures from using it to promote his electoral opponents, and he created yet another contradiction when he claimed that he took the cash in an effort (never executed, we note) to "sting" its donors. R. 76 at 232, 237. None of these versions of Traficant's activities coheres well with his claim on appeal that he initially took cash thinking the crime figures were legitimate political supporters, and that he had to continue to go along with them after discovering their real intentions in order to protect himself from their violence.

■ *Fraud.* The Tax Commissioner bears the burden of proving fraud. 26 U.S.C. § 7454(a). Fraud must be proven by clear and convincing evidence, Rule 142(b), Rules of Practice and Procedure of the United States Tax Court, 26 U.S.C. foll. § 7453. A court reviewing a finding that a taxpayer fraudulently avoided tax may reverse that finding only if it is clearly erroneous. *Solomon v. Commissioner,* 732 F.2d 1459, 1461 (6th Cir.1984).

Traficant does not devote a separate argument to the sufficiency of evidence of tax fraud but our review of the record makes us confident that the Tax Court committed no clear error in finding that Traficant fraudulently concealed income in order to avoid paying tax.

Fraud may be proven by circumstantial evidence. *Biggs v. Commissioner,* 440 F.2d 1, 5 (6th Cir.1971). We consider that the proven deviations from Traficant's campaign-donation record keeping procedures, his failure to report these monies as donations to the campaign, and his inconsistent explanations of his conduct all point towards fraud, both in common sense and under existing law. *Solomon v. Commissioner,* 732 F.2d at 1461; *Ruark v. Commissioner,* 449 F.2d 311, 312–13 (9th Cir. 1971); *Bahoric v. Commissioner,* 363 F.2d 151, 153–54 (9th Cir.1966). The Tax Court, furthermore, recited a whole series of actions which Traficant was proven to have taken that are highly probative of a fraudulent attempt to conceal these funds, including various money-laundering transactions and a direct request to FBI agents that they assist him in covering up the bribes. Finally, these monies do not appear anywhere in Traficant's income tax return for the year in which he received them. The Tax Court's findings and conclusions were not made in error.

## PROCEDURAL RULINGS

Traficant appeals from several procedural rulings of the Tax Court. He points out one error, but we believe it was harmless.

■ *Co-counsel.* At the suppression hearing Traficant, through his attorney, pe-

titioned the Tax Court for permission to conduct his own case with this attorney serving as co-counsel. Traficant himself is not an attorney. The Tax Court refused to allow the proposed co-counsel arrangement, invoking its "duty to manage this courtroom in a way that's going to assure fairness and the correct determination of the facts and the truth in this case." R. 52 at 8. The Tax Court instructed Traficant that he could choose whether to be represented by his attorney, in which case he could not speak directly to the court other than as a witness, or to be represented by himself, in which case his attorney would be required to withdraw. The consequences of each alternative were made very clear. Given this choice, Traficant elected to represent himself.

On appeal, Traficant asserts that the Tax Court improperly imposed on his right to represent himself the condition that he could not retain his attorney as co-counsel. No right to "hybrid representation" appears in the relevant rules of the Tax Court. Tax Court Rule 24(a). Even in criminal cases the defendant has no absolute right to hybrid representation. *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir.1981). We see no merit in this assignment of error.

*Cross-examination.* Traficant appeals from limits placed on his cross-examination of government witnesses. Traficant invoked his Fifth Amendment privilege against self-incrimination rather than answer interrogatories about the authenticity of his signed statement to the FBI and the tape-recordings of conversations between Traficant, the Carabbias and others. The Tax Court honored the privilege but advised Traficant that he would not be allowed to secure an improper advantage in discovery by invoking it, and ruled that Traficant would not be permitted to introduce evidence as "to matters that ... should be part of [his] response to the subject interrogatories," or to introduce any documentary evidence which, if he had not invoked the privilege, the Government would reasonably have been enabled to obtain. R. 30.

■ We believe it was proper under principles of reciprocity for the Tax Court to bar Traficant, once he had invoked the privilege against self-incrimination on the authenticity of the statement and the tapes, from introducing other evidence on *that matter.* Such limits are properly within the scope of cases holding that a party to civil litigation or other non-criminal proceedings may encounter costs imposed in exchange for the assertion of the Fifth Amendment privilege as long as they are not so high as to force abandonment of the privilege. *Spevack v. Klein*, 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967); *see also Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Note, however, that when the issue is whether a court may impose broad limits on the admissibility of evidence, the cases permit only limits directly related to the scope of the asserted privilege. *Securities and Exchange Commission v. Cymaticolor*, 106 F.R.D. 545 (S.D.N.Y.1985); *In re Anthracite Coal Antitrust Litigation*, 82 F.R.D. 364 (M.D.Pa.1979). The Tax Court's holding in its published opinion in this case that it had the power to limit Traficant's exploration not only of the authenticity of the documentary evidence but also of the very contents and significance of those exhibits was incorrect as a matter of law.

■ We need not reverse any actual applications of the Tax Court's bar to Traficant's conduct of his case, however, because Traficant has not shown us any ruling that prevented him from adducing evidence that would have been otherwise admissible. His brief points to limits placed on his cross-examination of Government witnesses at the suppression hearing concerning the tapes and the signed statement. His brief notwithstanding, the Tax Court nowhere relied on its privilege ruling to limit his cross-examination of several witnesses (Lawrence K. Lynch, Dorothy Carabbia, Robert G. Kroner and Mark S. Swanger, Jr.). A limit based on Traficant's assertion of the privilege was imposed on his cross-examination of Albert S. Celec, R. 53 at 157–60, but—as the Tax Court also

pointed out—the questions Traficant sought to ask were beyond the scope of the Government's direct examination of this witness. Fed.R.Evid. 611(b). In cross-examining Sam Traficanti, Traficant was barred from inquiring into the accuracy of the tapes, R. 53 at 181–84, but, as we have held, such a limit was proper. Finally, Traficant was actually barred from asking Traficanti a question about the contents of the tapes. R. 53 at 195–97. This would be error if it were not for the fact that, at the suppression hearing, the relevance of the tapes had been held *not* to be at issue. R. 52 at 4. Therefore, inquiry into their contents was irrelevant, and would have been inadmissible under Federal Rules of Evidence 401 and 402.

Finally, Traficant appeals from the Tax Court's ruling at an *in camera* session that a statement made by Orlando Carabbia would not be admitted. This statement was hearsay not within any recognized exception to the hearsay rule, and we decline to disturb the Tax Court's ruling that it should not be admitted.

*Admissibility of tapes.* Traficant argued before the Tax Court, and argues again on appeal, that the tapes of his conversations with the Carabbias were inadmissible under the wiretap provisions of the Omnibus Crime Control and Safe Streets Acts, 18 U.S.C. § 2510 *et seq.* One provision of the Act, as it stood at the time of the relevant events (it has since been amended) reads:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication ... *unless such communication is intercepted for the purpose of committing any criminal or tortious act ... or for the purpose of committing any other injurious act.*

18 U.S.C. § 2511(2)(d) (amended 1986) (emphasis added). A party attempting to suppress a recording bears the burden of proving that it was made for an impermissible purpose. *United States v. Truglio,* 731 F.2d 1123, 1131 (4th Cir.), *cert. denied,* 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 130 (1984); *United States v. Phillips,* 540 F.2d 319, 326 (8th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976).

■ The Tax Court held a lengthy hearing on Traficant's Wiretap Act claim and concluded that he had failed to carry his burden. It noted that general character evidence of Charles Carabbia's "penchant for violence and intimidation" was not probative of the point in issue: Carabbia's *specific unlawful intent* in making *these tapes.* R. 54 at 435. The Court further found that Traficant had adduced no evidence that the tapes had ever been used in any unlawful scheme, or that any threat had been made to use them. R. 54 at 443–47. We see no reason to hold these findings clearly erroneous.

■ Moreover, we are convinced that the Tax Court's ruling admitting the tapes can be affirmed on another ground. This Court has held that the provision of the Wiretap Act upon which Traficant relies was not intended to protect wrongdoers whose criminal activity is tape recorded by their own confederates. *United States v. Underhill,* 813 F.2d 105 (6th Cir.), *cert. denied sub nom. Rayburn v. United States,* 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 and *sub nom. Tata v. United States,* 483 U.S. 1022, 107 S.Ct. 3268, 97 L.Ed.2d 766 and *sub nom. Osborne v. United States,* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 98 and *sub nom. Person v. United States,* 484 U.S. 821, 108 S.Ct. 81, 98 L.Ed.2d 43 (1987). Such partners in crime cannot rely on the Wiretap Act to suppress the resulting evidence, even though they did not personally arrange for tape-recordings to be made. *Id.* at 112. We believe the principle of *Underhill* applies in the setting of civil fraud proceedings under the Internal Revenue Code as well.

*Statement of Angelo Lonardo.* In his cross-examination of FBI agent Kroner, Traficant attempted to adduce a statement purportedly made to Kroner by Angelo Lonardo. R. 77 at 446–47. This statement was clearly hearsay and its exclusion was entirely proper.

**267**

## RECUSAL

 Traficant moved that Judge Williams recuse himself from this case because a reasonable person would question his impartiality. 28 U.S.C. § 455(a).[2] Chief Judge Samuel B. Sterrit of the United States Tax Court issued an order denying the motion. R. 69, JA 116. In his order Chief Judge Sterrit relied on a thorough review of the motion and the transcripts, and on an interview with Judge Williams in which the latter stated that he had no preconceived ideas about the merits of the present case.

Traficant points to several episodes in the proceedings which he believes demonstrate Judge Williams' prejudice. These episodes are nothing more than the Judge's rulings against Traficant on the merits: rulings barring Traficant from simultaneously representing himself and retaining his attorney as co-counsel; statements made at a hearing on Traficant's motion for a continuance in which Judge Williams deprecated Traficant's conduct of the motion and expressed support for the Government in resisting it; and a statement in the Tax Court's published opinion explaining why Traficant was not permitted certain cross-examination. None of these passages demonstrates that Judge Williams entertained a bias against Traficant.

 Finally, Traficant argues that Chief Judge Sterrit improperly relied on Judge Williams' own assessment of his ability to conduct the case impartially. It is true that the amended Recusal Act calls not for a subjective assessment but rather for a determination whether recusal would seem fair to a reasonable person. *Roberts v. Bailar*, 625 F.2d 125, 128–29 (6th Cir. 1980). But here Chief Judge Sterrit stated that he found "nothing in [the] transcripts which would lead him to believe that Judge Williams cannot conduct the trial without prejudice or bias." This analysis fully satisfies the requirements of the statute and of fairness.

## CONCLUSION

Having found no reversible error on any issue raised on this appeal, we AFFIRM the judgment of the Tax Court.

---

**2.** This provision reads:

Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

28 U.S.C. § 455(a).