DENNIS M. SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 5364-91
United States Tax Court
T.C. Memo 1993-548; 1993 Tax Ct. Memo LEXIS 566; 66 T.C.M. (CCH) 1396; November 22, 1993, Filed *566 Decision will be entered under Rule 155. For petitioner: Jeffrey A. Catanzarite. For respondent: Katherine Lee Wambsgans. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to Tax
Section
Section
Section Year
Deficiency
6653(b)(1)(A)
6653(b)(1)(B)
6661(a)
1986
$ 19,705.52
$ 14,779.14
[1]
$ 4,926.38
1987
15,240.24
11,430.18
[2]
3,810.06
Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions by the parties, the issues to be decided are: (1) The amount of taxable income petitioner received from his jewelry sales activities for the taxable years 1986 and *567 1987; (2) Whether petitioner is liable for additions to tax under section 6653(b)(1)(A) and (B) for fraud for the taxable years 1986 and 1987; and (3) Whether petitioner is liable for additions to tax under section 6661(a) for substantial understatements of income tax for the taxable years 1986 and 1987. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. At the time he filed his petition, petitioner Dennis M. Smith resided in Akron, Ohio. Petitioner has never been married and has no dependents. Petitioner resides with his mother, age 72, and her two sisters, ages 70 and 78, in a duplex frame house owned by his mother and aunts. Petitioner has resided with his mother and aunts for 20 years and does not pay any rent. Petitioner has saved his money since 1958 when he was 10 years old and opened his first savings account. He started his first job in 1966 for the Akron Board of Education in building maintenance, earning $ 60 to $ 70 a week. He did not own a car at that time and had virtually no expenses, which enabled him to save much of his earnings. At *568 the time of the trial in this case, petitioner owned a 1977 Cutlass Supreme valued at $ 500, a 1976 Grand Prix with minimum book value, and a 1984 Toronada valued at $ 1,500. Petitioner was graduated from the University of Akron in 1972 and received a bachelor's degree in industrial management. Petitioner did not do well in the accounting and economics courses he took in college. Since his graduation from the University of Akron, petitioner has held sales positions in department stores. During the years at issue, petitioner was a full-time salesman at the Higbee Company. His duties at the Higbee Company included the sales of men's suits and all forms of men's clothing. Except for entering cash and charge transactions on the cash register, petitioner did not have any accounting responsibilities at the Higbee Company. Petitioner was paid commissions on the sales he made. He received wages from the Higbee Company in the total amounts of $ 19,375.36 and $ 18,947.59, for the years 1986 and 1987, respectively. When he received his wages from the Higbee Company, petitioner did not deposit his paychecks into any banking account, although he had six bank accounts. Instead, he cashed *569 several paychecks, paid his living expenses, and ultimately deposited some of the remaining funds into one or more of the bank accounts he maintained at the Transohio Savings Bank. During the years at issue, petitioner also conducted jewelry sales activities. He received taxable income from the jewelry sales, which he did not report on his tax returns. The jewelry sales activities included selling jewelry and accessories such as eelskin and leather belts and bags, custom designing jewelry pieces for sale to individuals, and repair work. Petitioner regularly purchased jewelry from suppliers after an individual placed an order with petitioner from a catalog provided to petitioner by the suppliers. During 1986 and 1987, several of petitioner's jewelry suppliers invoiced him under the name of Jewelry and Gems International. In 1987, petitioner opened a business bank account under the name of Jewelry and Gems International. The record does not indicate whether petitioner used that business account exclusively for his jewelry sales activity after that time, or whether all his jewelry sales after that time were reflected in that account. Originally, in the early 1980s, petitioner's *570 involvement with jewelry sales was very casual. He enjoyed jewelry and would answer friends' questions about jewelry. Eventually his friends began asking him to obtain items for them if he could. He did not carry any inventory and would check into trade magazines and journals to find ads from suppliers. Some of his activity involved repairs made by third persons. Petitioner would pay the repairman and then collect the money from the individual. Petitioner started receiving United Parcel Service (UPS) deliveries of jewelry in the early 1980s. UPS delivered packages to petitioner once or twice each week. Occasionally, if petitioner, his mother, and aunts were out, a neighbor who occupied the other half of the duplex would take delivery of the packages, except for COD packages. The amount due on each COD package was between $ 600 and $ 700. Once, when the neighbor was discussing petitioner's jewelry sales and the resulting tax liability with petitioner, petitioner told him that "What Uncle Sam doesn't know won't hurt him." [1]
*571 During 1986 and 1987, the deposits petitioner made into his various bank accounts came from his wages, interest from certificates of deposit (CD's), passbook savings interest, some reimbursements from relatives for bills he paid, some cash gifts from relatives for special occasions, and the cash receipts from his jewelry sales activity. Petitioner was able to save $ 500 from his wages each month. [2] Petitioner claimed that, at the beginning of 1986, he had between $ 7,000 and $ 10,000 cash on hand, some of which he used to pay for COD jewelry deliveries and the balance of which he eventually deposited into a bank account. When petitioner's CD's matured, he would take the interest in cash and roll over the principal. Eventually, he would deposit some of the cash into a bank account. *572 Petitioner's mother and aunts have dealt in cash all of their lives and do not have their own checking accounts, credit cards, or charge accounts. During the years at issue, the mother and aunts were not employed, but received income from Social Security checks, some dividend checks, and rental of the other half of the duplex. Sometimes they would pay the household expenses, and sometimes petitioner would pay. If petitioner paid, his mother and aunts would reimburse him in cash for some of his payments. Petitioner maintained a charge account at the Higbee Company. That account was used for the purchase of clothing, accessories, personal items, furniture, and other things that he, his mother, and aunts needed. His mother and aunts used the charge account because they were eligible for a discount at the store. Petitioner would pay the bill by check, and his mother and aunts would reimburse him for their portions of the bill. [3] There is no satisfactory evidence as to the amount of such reimbursements. *573 Petitioner made many of the repairs around the house. Occasionally, a repair required a plumber, electrician, roofer, or painter, in which case such a person was hired to perform the work. Petitioner's mother and aunts reimbursed him for some of the household expenses he paid. The two aunts did not drive and relied upon petitioner and his mother to drive them. The aunts reimbursed petitioner for gas and parking. They also reimbursed him for the cost of the meal if they went out to dinner. At trial, petitioner did not offer any credit card or charge account statements to substantiate the expenses or reimbursements. Since these documents were available and were not offered into evidence, the Court infers that the documents do not support petitioner's testimony. [4] While there no doubt were some reimbursements by the mother and aunts for some purchases and for some household expenses, these were in rather nominal amounts. See supra note 3. *574 During 1986 and 1987, petitioner's mother and aunts each made some cash gifts to him. There is no satisfactory evidence as to the amount of such cash gifts. [5]
Petitioner prepared his U.S. Individual Income Tax Returns, Forms 1040A, for the taxable years 1986 and 1987. Petitioner received wages from the Higbee Company in the amounts of $ 19,375.36 during 1986 and $ 18,947.59 during 1987, which amounts he reported as income on the Forms 1040A. Petitioner received interest income in the amounts of $ 12,315.47 in 1986 and $ 12,134.32 in 1987, which amounts he reported as income on the Forms 1040A. Although he received taxable income from his jewelry sales, petitioner *575 did not report any of his earnings from jewelry sales on his 1986 and 1987 Forms 1040A. Petitioner did not make any reference to or otherwise disclose the existence of his jewelry sales activities on his Forms 1040A. On March 23, 1989, petitioner was notified that his income tax return for 1986 was under examination. On April 11, 1989, two revenue agents conducted the initial interview relative to the examination of petitioner's return. In response to questions by the agents, petitioner stated that he had not received any additional income that was not reported on the return. He told the agents that he did not have any income from a hobby. When they asked whether he had purchased any jewelry, petitioner stated that he purchased approximately $ 1,500 worth of jewelry for himself and as gifts for friends. Prior to the meeting, the agents had asked petitioner to produce his records. Petitioner provided the agents with all of the canceled checks and bank deposits and records that he had for his six bank accounts. Respondent obtained the rest of the bank records from the bank. Petitioner's bank statements indicated that he had deposited unusually large amounts of cash in relation *576 to his reported income each year. Some of the checks indicated substantial amounts made out to various individuals, some of which petitioner stated represented jewelry purchases. Petitioner stated that it was a hobby and that he sold the jewelry at cost. When asked whether the deposits were a result of jewelry sales, petitioner responded "not really". Petitioner told the agents that the deposits represented wages, interest income, and gifts. One of the agents, who saw petitioner only during the first interview, testified that, in his opinion, petitioner perhaps thought his statements were truthful, but that the answers did not comport with the facts. Other than the unusual cash deposits and the jewelry purchases, petitioner's lifestyle was modest. After the initial interview, petitioner found some VISA and MasterCard statements, although the agents had not specifically requested those statements prior to the first interview. Petitioner provided the agents with the credit card statements, including the charge account statements from the Higbee Company, and receipts that he had for jewelry purchases. None of these credit card statements or charge account statements were offered *577 in evidence. See supra note 4. During a second interview on June 27, 1989, petitioner initially told the agents that he did not solicit business, that his sales of jewelry were casual. When asked if he sold the jewelry for profit he stated, "Well, it's ridiculous not to sell it for a profit." He stated that he sold jewelry to friends and acquaintances he met in bars and restaurants but did not remember any of their names. He said he purchased the jewelry from one mail order company but could not recall the name. During a third interview held on August 10, 1989, petitioner admitted that he sold the jewelry at a profit of about 25 percent and provided the agents with names of his suppliers. Petitioner did not maintain a customer list or any formal books and records. Petitioner did not maintain a segregated bank account for his jewelry business activity. Petitioner never gave the agents any information or records regarding the gross receipts from his jewelry sales activity. Respondent reconstructed petitioner's income for 1986 and 1987 under the bank deposits and expenditures method. Petitioner maintained six accounts in the Transohio Savings Bank into which he made the *578 following deposits during the years at issue: Account Number
1986 1987 010-4-001912
$  1,368.00
$  1,440.00
020-6-002057
16,539.65
16,550.98
010-6-006166
37,885.22
48,477.28
020-4-002620
1,835.00
2,509.00
103010626 [1]
2,000.00
2,000.00
104020391
0.00
6,948.35
Total Deposits (excluding interest [2])
$ 59,627.87
$ 77,925.61
The parties disagree as to the amounts of the deposits that are attributable to nontaxable sources. The parties agree that petitioner deposited funds attributable to nontaxable sources into his Transohio Savings Bank accounts in the amount of $ 14,203.56 ($ 14,028.56 + $ 175) in 1986 and in the amount of $ 35,242.51 ($ 35,167.51 + $ 75) in 1987. These nontaxable sources included interest (already reported on Forms 1040A) in the amount of $ 6,264.56 in 1986 and $ 4,730.98 *579 in 1987. The computation of total bank deposits accounts for interest earned on the bank accounts. The record does not establish that any further amounts of petitioner's interest income (already reported on his Forms 1040A) were deposited into petitioner's bank accounts during the years before the Court. Although some portions of his wage income for 1986 and 1987 were at some point deposited into one or more of his various bank accounts, there is no evidence as to the exact amounts of such wage income for 1986 and 1987 deposited during those years. [6] The record simply shows that petitioner always cashed his paychecks, that he liked to have a lot of cash on hand, and that he dealt extensively in cash. Petitioner kept no records to show the sources of his various cash deposits into his bank accounts. Since petitioner bears the burden to establish any errors in the deficiency determinations, the Court will not assume that such cash deposits necessarily came from his wage income or the balance of the interest income that he reported on his tax returns. In the notice of deficiency, respondent determined that none of the reported wage income was included in the cash deposits and *580 hence none was deducted as part of the nontaxable (or already taxed) sources. Petitioner made total expenditures for the purchase of jewelry and related items in connection with his jewelry sales activities in the amounts of $ 11,843.17 ($ 11,837.89 + $ 5.28) in 1986 and $ 25,748.36 ($ 25,337.46 + $ 410.90) in 1987. Of those expenditures, $ 7,734.07 in 1986 and $ 17,008.49 in 1987 were cash expenditures. [7] In connection with the jewelry sales activities, respondent agrees that petitioner is allowed deductions for meals and lodging in the amounts of $ 235.81 in 1986 and $ 180.30 in 1987, and for mileage in the amounts of $ 2,520 in 1986 and $ 2,700 in 1987. *581 Petitioner filed a Form 1040 for the taxable year 1988 on August 16, 1989, at which time he was aware that his 1986 Form 1040A was under audit. Petitioner reported, on a Schedule C attached to his 1988 Form 1040, gross receipts in the amount of $ 62,313, costs of goods sold in the amount of $ 39,324, deductible expenses in the amount of $ 3,003, and a net profit in the amount of $ 19,986 from his jewelry sales business. OPINION This is a fraud case with the normal split burden of proof. Petitioner has the burden of proving by a preponderance of the evidence that the deficiencies for each of the years at issue as determined by respondent are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Respondent has the burden of proving by clear and convincing evidence the elements of fraud. Sec. 7454(a); Rule 142(b); Zack v. Commissioner, 692 F.2d 28, 29 (6th Cir. 1982), affg. T.C. Memo. 1981-700. I Deficiencies
Respondent determined petitioner's gross receipts under the cash deposits and expenditures method. Respondent did not reduce the bank deposits figures to reflect any *582 portion of petitioner's wages or the balance of the interest petitioner earned for each of the years at issue. At the outset we note that even if petitioner had deposited his entire W-2 wage income (gross, not take-home pay) and his entire interest income into his bank accounts, which he did not do, there would still be excess deposits of $ 27,937 for 1986 and $ 46,843 for 1987. Petitioner reported all of his wages and interest income on his 1986 and 1987 returns. In adjusting the bank deposits for nontaxable (or already reported) sources, respondent reduced the deposits by the amounts of interest income that could be identified as such. There is no evidence to establish that any other amounts of petitioner's reported interest income were deposited into the bank accounts. On the other hand, respondent made no adjustment for any of petitioner's reported wage income. Petitioner never deposited his paychecks into his bank accounts; he always cashed his paychecks; he enjoyed having large amounts of cash on hand and dealt extensively in cash. Petitioner testified that after he cashed his paychecks and paid his expenses, he kept the cash for a while and then deposited the balance *583 into his bank accounts. There is no evidence to establish when or in what amounts any cash from petitioner's wage income was deposited into his bank accounts. See supra note 6. However, in view of petitioner's rent-free lifestyle and the fact that his mother and aunts reimbursed him for their personal purchases on his charge accounts and for some of his payments of household expenses, the Court believed his testimony that he was able to save $ 500 a month from his wages. This money was available to be deposited as cash into his bank accounts or to make cash purchases of jewelry. Respondent assumed that none of his reported wage income was either deposited as cash into his bank accounts or used for cash purchases of jewelry items. See supra note 7. The Court concludes that a total of $ 6,000 per year ($ 500 x 12 months) should be deducted either from the deposits into the bank accounts or from the cash purchases that were added to income. See supra note 7. Using our best judgment we will decrease the bank deposits by $ 6,000 each year, but bearing heavily against petitioner whose lack of records and inexactitude are of his own making, we are unwilling to make any *584 further reductions attributable to his wage income. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). In fact, mindful that $ 6,000 per year constitutes a substantial percentage (18 to 19 percent) of petitioner's total reported W-2 wage income and interest income each year, we think any further adjustments for wage income or interest income would be unguided and unwarranted judicial largess. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). Petitioner asserts that the computation of cash deposits attributable to nontaxable sources should be increased to reflect cash reimbursements and gifts from his mother and aunts. Because we think petitioner coached his mother and aunt for their testimony, we give little weight to their testimony as to the amounts of the reimbursements and gifts. See supra note 3. However, we do think they made some cash reimbursements and some cash gifts to petitioner. Therefore, we must use our best judgment to approximate the amount of reimbursements and gifts. Cohan v. Commissioner, 39 F.2d at 544. Based on the evidence at hand, we find that *585 the gross receipts should be reduced to reflect total cash reimbursements of $ 2,000 each year and total cash gifts of $ 500 each year. Petitioner also alleges that he had cash on hand at the beginning of 1986 in an amount between $ 7,500 and $ 10,000. Petitioner has offered no evidence in support of his claim. We did not find his testimony credible, and we do not believe that he had such cash on hand. Moreover, we think any cash on hand was simply the revolving amounts of wage income that he kept on hand after cashing his paychecks and then periodically deposited. [8] Therefore, he is not entitled to a reduction from gross receipts for any amount other than the $ 6,000 already allowed. *586 Based on the reductions in gross receipts we have allowed above, petitioner had gross receipts in the amount of $ 44,658.38 and net profit in the amount of $ 30,059.40 in 1986, and gross receipts in the amount of $ 51,191.59 and net profit in the amount of $ 22,562.93 in 1987, computed as follows: Item
1986
1987
Deposits
$ 59,627.87 $ 77,925.61 Cash expenditures
7,734.07 17,008.49 Reported wages
(6,000.00)
(6,000.00)
Nontaxable sources
(14,203.56)
(35,242.51)
Reimbursements
(2,000.00)
(2,000.00)
Gifts
(500.00)
(500.00)
Gross receipts
44,658.38 51,191.59 Cost of goods sold
(11,843.17)
(25,748.36)
Business Expenses
Meals & lodging
(235.81)
(180.30)
Mileage
(2,520.00)
(2,700.00)
Net profit
$ 30,059.40 $ 22,562.93 Petitioner had unreported taxable income in the amounts of $ 30,059.40 for 1986 and $ 22,562.93 for 1987 from his jewelry sales business. II Additions for Fraud
In the case of a return the due date for which is after December 31, 1986 (determined without regard to extensions), and before January 1, 1989, section 6653(b) provides as follows: (1) In general. -- If any part of any underpayment (as defined in subsection (c)) *587 of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of -- (A) 75 percent of the portion of the underpayment which is attributable to fraud, and (B) an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax or, if earlier, the date of the payment of the tax.
(2) Determination of portion attributable to fraud. -- If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes is not attributable to fraud.
Respondent determined in the notice of deficiency that petitioner is liable for the additions to tax for fraud under section 6653(b)(1)(A) and (B) for each of the years at issue. Respondent bears the burden of proof and must establish each element of fraud by clear and convincing evidence. Sec. 7454(a); *588 Rule 142(b); Smith v. Commissioner, 926 F.2d 1470, 1475 (6th Cir. 1991), affg. T.C. Memo. 1989-171; Traficant v. Commissioner, 884 F.2d 258, 263 (6th Cir. 1989), affg. 89 T.C. 501 (1987); Zack v. Commissioner, 692 F.2d at 29. Respondent must prove by clear and convincing evidence the two elements of fraud, (1) the existence of an underpayment of tax each year, and (2) that some part of the underpayment is due to fraud. See Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). In order to establish fraud for purposes of the addition under section 6653(b)(1)(A) and (B) for the years at issue, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Sec. 6653(b)(2). Respondent must prove fraud in each of the years involved. Drieborg v. Commissioner, 225 F.2d 216, 220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court *589 dated Feb. 24, 1954. Fraud is actual, intentional wrongdoing, and the intent is the specific purpose to evade a tax believed to be owing. Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Respondent must show that petitioner intended to evade taxes that he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990). Fraud is never to be presumed. Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Webb v. Commissioner, 394 F.2d at 377. The existence of fraud is a question of fact to be determined on the basis of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published *590 opinion 578 F.2d 1383 (8th Cir. 1978). Fraud, however, can seldom be proved by direct proof of the taxpayer's intention. Biggs v. Commissioner, 440 F.2d 1, 5 (6th Cir. 1971), affg. T.C. Memo. 1968-240. Fraud can be established by strong circumstantial evidence and by reasonable inferences drawn from the taxpayer's entire course of conduct. Spies v. United States, 317 U.S. 492, 499 (1943); Traficant v. Commissioner, 884 F.2d at 264; Gajewski v. Commissioner, supra at 200. Courts frequently list various factors or "badges of fraud" from which fraudulent intent may be inferred. Although such lists are nonexclusive, some of the factors this Court has considered as indicative of fraud are (1) failure to report income over an extended period of time, (2) failure to furnish the Government with access to his records, (3) failure to keep adequate books and records, (4) the taxpayer's experience and knowledge, especially knowledge of tax laws, (5) the taxpayer's implausible explanations of conduct given during *591 the audit or at trial, and (6) dealing in cash. Smith v. Commissioner, 926 F.2d at 1479; United States v. Walton, 909 F.2d at 926; Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; Meier v. Commissioner, 91 T.C. 273, 297-298 (1988) (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601). The taxpayer's evasiveness on the stand, inconsistencies in his testimony, and the lack of credibility of such testimony are heavily weighted factors in considering the fraud issue. See Toussaint v. Commissioner, 743 F.2d at 312. Petitioner began his jewelry sales activities in the early 1980s. During his first interview with the revenue agents, he denied he had any unreported income. During his third interview with the revenue agents, he admitted that he made a 25-percent profit from the jewelry sales activities. His 1988 return indicates that he made a 32-percent profit during *592 the 1988 taxable year. In 1986 and 1987, he made net profits that were quite substantial in relationship to the wages he earned from his full-time employment at the Higbee Company during the same period. Yet, he failed to report any income from the jewelry sales activities during those years. Petitioner did not maintain a separate bank account for his jewelry sales activities, did not maintain complete records of jewelry purchases or sales, did not provide the revenue agents with names of any customers, was reluctant to provide the agents with a complete list of suppliers, and dealt extensively in cash. Most telling is petitioner's comment to his neighbor that "What Uncle Sam doesn't know won't hurt him." This statement is direct evidence that petitioner intended to evade taxes that he knew he owed by concealing his income from his jewelry sales activities. Having considered all of the evidence before us, we conclude that petitioner failed to report substantial amounts of income from his jewelry sales activity with the intent to evade the tax known to be due and owing on such income during the taxable years 1986 and 1987. The entire underpayment is attributable to petitioner's *593 jewelry sales activity and is due to fraud. Petitioner has failed to prove that any portion of the underpayment was not due to fraud. Sec. 6653(b)(2). Therefore, the additions to tax under section 6653(b)(1)(A) and (B) apply to the entire underpayment each year. III Statute of Limitations
The parties agreed at trial that there was no statute of limitations issue in this case. Petitioner raised this issue for the first time in his reply brief. The statute of limitations is an affirmative defense that must be pleaded or it is deemed to be conceded. Rules 34(b)(4) and 39. Where the issue of the statute of limitations is not properly raised in the pleadings, no burden is placed on respondent to show any extension of the statutory period. Rules 34(b)(4) and 39; Robinson v. Commissioner, 12 T.C. 246 (1949), affd. 181 F.2d 17 (5th Cir. 1950); Dale v. Commissioner, T.C. Memo. 1981-331. Because petitioner did not raise the statute of limitations issue in his petition, that defense to the assessment and collection of tax is unavailable. Robinson v. Commissioner, 12 T.C. at 248; *594 Douglas Family Trust v. Commissioner, T.C. Memo. 1984-629. Furthermore, because we have found fraud in both of the years at issue, there is no statute of limitations, and the tax and additions can be assessed and collected "at any time". Sec. 6501(c)(1) and (2); Badaracco v. Commissioner, 464 U.S. 386 (1984). IV Substantial Understatement of Income Tax
If for any taxable year there is a substantial understatement of income tax, an addition in an amount equal to 25 percent of the amount of any underpayment attributable to such understatement is applied to the tax. Sec. 6661(a). There is a substantial understatement of income tax for a taxable year if the amount of the understatement for the year exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $ 5,000. Sec. 6661(b)(1)(A). There appears to be such a substantial understatement of income tax each year, but the exact amounts can be determined in the Rule 155 proceedings. Generally, if a taxpayer has substantial authority for his tax treatment of an item or has made adequate disclosure thereof on his return, *595 there can be a reduction in the understatement. Sec. 6661(b)(2)(B). There is no substantial authority for failing to report taxable income, particularly when the failure, as here, is with intent to evade taxes. Petitioner also made no disclosure on his returns as to his omission of taxable income from his jewelry sales activities. Accordingly, there is no basis for any reduction of the substantial understatement to be computed in the Rule 155 proceedings. Finally, we assume petitioner has now abandoned his earlier claim that he should receive a waiver of the substantial understatement addition. Sec. 6661(c). He did not have reasonable cause for the understatement, and he did not act in good faith in omitting the taxable income. Sec. 6661(c). The record does not indicate that he ever requested a waiver or that respondent ever had an opportunity to exercise her discretion in that regard. See Klieger v. Commissioner, T.C. Memo. 1992-734. In any event, the standard of review in the case of a refusal to grant a waiver is whether respondent abused her discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). *596 There is no evidence in this case as to any abuse of discretion. To reflect the above holdings and the parties' concessions, Decision will be entered under Rule 155. Footnotes
1. 50 percent of interest due on $ 19,705.52, computed from April 15, 1987, to the earlier of the date of assessment or the date of payment.↩
2. 50 percent of interest due on $ 15,240.24, computed from April 15, 1988, to the earlier of the date of assessment or the date of payment.↩
1. The neighbor did not testify as to petitioner's jewelry sales activities during the years at issue, because the neighbor had moved from the duplex in March of 1985. However, based on petitioner's own testimony about increasing activity, it is clear that sales in 1986 and 1987 were greater than in the earlier years. To the extent that the neighbor's testimony conflicted with that of petitioner, the Court found the neighbor more credible than petitioner.↩
2. Since petitioner did not pay any rent to his mother and aunts, and since they even reimbursed him for some of the household expenses he paid, the Court accepts his testimony that he was able to save $ 500 a month from his wages.↩
3. Petitioner testified that his mother and aunts each reimbursed him $ 200 to $ 300 per month, or $ 2,400 to $ 3,600 each per year, for the charges placed on his account. The Court did not believe his testimony and does not accept his estimates. Petitioner's mother and one of his aunts testified that they each reimbursed petitioner $ 1,700 each year. The record is unclear as to whether these alleged reimbursements were for charge card or charge account purchases, household expenses, or both. In any event, the Court did not believe their testimony. The second aunt attempted to testify at the trial. When it became apparent that she was confused even as to her own address, petitioner's attorney withdrew her as a witness. The testimony of the mother and the other aunt was confused, at times incoherent, and generally nonresponsive to the questions posed to them. What was painfully evident to the Court was that each woman had been told to say and, in answers nonresponsive to the questions asked, said that she had made reimbursements of $ 1,700 and gifts of $ 2,000 to petitioner each year. The Court did not believe them and concludes that they had been coached by petitioner. Petitioner's mother told the Court that she did not talk to her sisters or petitioner's attorney regarding the amount of the gifts or reimbursements, but she did talk to petitioner regarding the amounts.↩
4. Petitioner testified that these credit card and charge account statements were in his attorney's possession, but the attorney did not offer them into evidence. The Court stated on the record that the Court would draw adverse inferences if the documents were not offered; the documents were never offered. Thus the Court concludes that these credit card and charge account statements do not support petitioner's testimony. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947).
5. Petitioner estimated the amounts of the gifts to be a few thousand dollars from each of his aunts and mother. His mother and one of his aunts each testified that the amount of her cash gifts was approximately $ 2,000 per year. Again, the Court did not believe this testimony and concludes the witnesses were coached by petitioner. See supra↩ note 3.
1. Account number 103010626 is an individual retirement account.↩
2. The parties expressly so stipulated. However, from other stipulations and the parties' arguments on brief, it is apparent that this interest refers to interest earned on these bank accounts and not to all of petitioner's interest income on his CD's and passbook savings accounts.↩
6. It is also conceivable that some portions of wage income from an earlier year (presumably reported on the tax return for that earlier year) could have been deposited into these accounts in 1986 and 1987, but again there is no evidence as to the amounts, if any.↩
7. Respondent also apparently assumed that none of the cash expenditures for jewelry purchases ($ 7,734.07 for 1986 and $ 17,008.49 for 1987) came from the wage income that had been reported on the tax returns. Hence, in the notice of deficiency, respondent added these amounts to the deposits in determining petitioner's gross receipts from the jewelry sales.↩
8. The Court earlier adverted to the possibility that some of his wage income from the prior year could have been deposited during the years before the Court. See supra↩ note 6. If so, then some part of the 1986 and 1987 income would similarly still be in his pockets and undeposited at the end of each of those years. Thus, no further adjustment to the $ 6,000 per year allowed by the Court is warranted.