**ARP FILMS, INC., Amerex Films, Inc., and Claude S. Hill, Plaintiffs–Appellants, Cross–Appellees,**

v.

**MARVEL ENTERTAINMENT GROUP, INC., Defendant–Appellee, Cross–Appellant.**

Nos. 1585, 1750, Dockets 91–7195, 91–7197.

United States Court of Appeals, Second Circuit.

Argued June 24, 1991.

Decided Dec. 24, 1991.

---

Jared Stamell, New York City (Stamell, Tabacco & Schager, E. Allan Farnsworth, of counsel), for plaintiffs-appellants, cross-appellees.

Gideon Cashman, New York City (Stephen F. Huff, Jamie M. Brickell, Charles B. McKenna, Pryor, Cashman, Sherman & Flynn, of counsel), for defendant-appellee, cross-appellant.

Before CARDAMONE, MINER, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Plaintiffs-appellants, cross-appellees ARP Films, Inc. ("ARP"), Amerex Films, Inc. ("Amerex"), and Claude S. Hill ("Hill") (collectively "plaintiffs") appeal, and defendant-appellee, cross-appellant Marvel Entertainment Group, Inc. ("Marvel") cross-appeals, from orders and a judgment of the United States District Court for the Southern District of New York, Kenneth Conboy, *Judge*, entered in this action arising from a contractual dispute involving the distribution of cartoon films.

For the reasons that follow, we affirm in all respects.

### Background

This action arises out of a contract dispute between Marvel and ARP involving the distribution of copyrighted properties. Marvel is the successor in interest to a series of corporations that have owned the copyrights to Spiderman and other fictional cartoon characters. The parties' long and often contentious relationship began in 1968, when a predecessor to Marvel, Magazine Management Company ("Magazine"), and a predecessor to ARP, Krantz Films, Inc. ("Krantz"), entered into an agreement (the "1968 Agreement") which granted Krantz the right to produce and exploit cartoon films embodying characters copyrighted and trademarked by Magazine, including Spiderman. Hill is the president of ARP and former principal of Krantz. The 1968 Agreement ultimately became the subject of litigation in which Marvel and Magazine sought to terminate Krantz's rights under the 1968 Agreement.

That litigation concluded in a 1976 settlement which gave rise to a new agreement (the "1976 Agreement") between Cadence Industries Corporation ("Cadence")[1], Magazine, and ARP.[2] Under the terms of the 1976 Agreement, a new company, Amerex, was formed to distribute certain cartoon film properties, the rights to which were owned by Marvel. ARP was to own the stock of Amerex. Half of that stock, however, was to be held in escrow by Marvel. Marvel's prior written approval was required regarding any proposed transfer of the Amerex stock held in escrow by Marvel.

In addition, the stock certificates of Amerex were to bear a legend specifying that the holder of the stock evidenced by the certificate had read, understood, and agreed to be bound by the 1976 Agreement. It was further agreed that Hill would be the sole owner of the stock of ARP, but that such stock could be assigned by Hill with the written approval of Marvel, which was not to be unreasonably withheld. Paragraph 8 of the 1976 Agreement provided:

In addition to all other remedies, ARP shall have the right to terminate the license as provided for by this agreement in the event of Marvel not substantially abiding by the terms and conditions of this agreement and in the event of Marvel's licensing rights to the Series to another, and Marvel shall have the right to terminate the license as provided by this agreement in the event of [Amerex's], ARP's or Claude Hill's not substantially abiding by the terms and conditions of this agreement or failing to substantially abide by the terms and conditions of the license for distribution of the Series and rights related thereto, *which terms and conditions include prompt accounting for such distribution, but except for such termination of license,*

---

1. Marvel was a division of Cadence at the time of the 1976 Agreement and at the outset of this litigation, and Cadence was initially a party to this litigation. Cadence thereafter sold the division to Marvel Entertainment Group, Inc., which was substituted for Cadence as a party pursuant to Fed.R.Civ.P. 25(c). All these entities are denominated "Marvel" hereinafter.

2. ARP Films, Inc., a Delaware corporation, was the original signatory of the 1976 Agreement.

That corporation thereafter assigned its rights under the 1976 Agreement, and transferred the stock it held in Amerex pursuant to that agreement, to an identically named Tennessee corporation. Hill served as president of both corporations. The jury found that these actions breached the 1976 Agreement, but that Marvel had allowed the statute of limitations regarding these breaches to expire. Both corporations are denominated "ARP" hereinafter.

*this agreement shall continue in full force and effect* [emphasis added].

ARP was to provide distribution services, including the personal services of Hill, to Amerex. Amerex was obligated to remit specified percentages of its gross receipts to Marvel and ARP, and to provide Marvel and ARP with periodic accountings of the exploitation of the Marvel properties. In addition to the 1976 Agreement, several letter agreements in 1979 and 1980 (the "Side Agreements") gave ARP the right to distribute new Marvel-owned cartoon film characters on a commission basis, and to distribute a new first-run series of Spider-man cartoons on a commission basis.

The parties operated successfully under the 1976 Agreement for a period of several years, but problems developed in the early 1980's. Beginning in 1981, Marvel began licensing home videocassette distributions of its films. In 1982, ARP confronted Marvel with the claim that the 1976 Agreement granted Amerex the exclusive right to distribute the films on videocassette for home use. Marvel disagreed, but ARP continued to assert this claim in the context of the ongoing distribution relationship. The discord mounted, and according to ARP, resulted in several efforts by Marvel to pressure ARP into relinquishing the claim to videocassette distribution. These alleged acts included the actual and threatened termination of certain distribution rights, threats of costly litigation, and, in 1986, the invoking of the pertinent provision of the 1976 Agreement to prevent a public offering of ARP's stock.

In July 1986, plaintiffs commenced the present action in state court against Marvel, which removed the case to the United States District Court for the Southern District of New York on the basis of diversity of citizenship. A separate action by Marvel against plaintiffs in the latter court was consolidated on plaintiffs' motion, without opposition. Plaintiffs claimed in their amended complaint that Marvel breached the 1976 Agreement by distributing Marvel cartoons on videocassette in violation of plaintiffs' exclusive right to do so, and by unreasonably withholding its consent to the public offering of ARP common stock. Marvel claimed, *inter alia*, that the 1976 Agreement conveyed no rights to distribute videocassettes, that Marvel's consent to the public sale of ARP stock had not been unreasonably withheld, that plaintiffs had breached the 1976 Agreement in numerous respects, resulting in its termination, and that plaintiffs had also committed various infringements of copyrights and trademarks held by Marvel.

By a letter to Hill (in his capacities as president of ARP and Amerex) dated November 12, 1986 (the "First Termination"), Marvel purported, on the basis of asserted violations of the 1976 Agreement, to terminate all distribution rights previously granted by Marvel to ARP and Amerex. The letter offered to allow the continued distribution of the properties covered by the 1976 Agreement, on a "courtesy" and "at will" basis, provided that the procedures specified in the 1976 Agreement were followed. Plaintiffs thereafter continued to receive payments under licenses entered into before the First Termination, and for a while continued to remit the appropriate percentage of those receipts to Marvel. Marvel, however, refused to approve any new licenses for the properties covered by the 1976 Agreement, contending that the information provided by plaintiffs concerning the proposed new licenses was inadequate, and not in accord with the 1976 Agreement.

In February 1987, plaintiffs stopped paying Marvel any share of distribution proceeds under the 1976 Agreement, and in April of that year plaintiffs ceased reporting to Marvel concerning the licensing activities of ARP and Amerex. By a letter to Hill dated September 2, 1987 (the "Second Termination"), Marvel advised that ARP's "failure to remit any monies to Marvel since March, 1987 constitutes an unjustified and material breach of any agreement by which ARP purports to have [distribution] rights and if all rights had not already been effectively terminated—which they most assuredly were—they are hereby so terminated."

After the close of discovery, Marvel moved for partial summary judgment. Marvel contended that plaintiffs had materially breached the 1976 Agreement as a matter of law by, *inter alia*, since early 1987 (1) refusing to account for the results of their exploitation of the Marvel properties, and (2) withholding payments due to Marvel from such exploitation. The court granted the motion in part, holding that plaintiffs had affirmed the contract after the First Termination by continuing licensing activity, and therefore could not continue to exploit their rights under the contract while at the same time indefinitely withholding their own performance pending adequate assurances from Marvel. *See Marvel Entertainment Group, Inc. v. ARP Films, Inc.*, 684 F.Supp. 818, 819–21 (S.D.N.Y.1988). The failure to perform on the part of ARP was therefore found to be a breach of the 1976 Agreement. The court concluded, however, that it could not decide as a matter of law that the breach was sufficiently material to give Marvel the right to terminate the contract, noting that "[m]ateriality of breach is ordinarily a question of fact to be determined at trial." *Id.* at 821.

Upon Marvel's subsequent renewal of its motion for summary judgment, however, the court reconsidered. The district court stated that paragraph 8 of the 1976 Agreement, quoted *supra* herein, specifically granted Marvel the right to terminate that agreement because of plaintiffs' admitted failure properly to account for the exploitation of the Marvel properties.[3] The court also stated that "it is now clear that ARP has withheld in excess of $400,000 of Marvel's contractual share of ARP's exploitation activities." The court concluded that "the 1976 Agreement terminated on September 2, 1987."

The grant of partial summary judgment was followed by a six week jury trial, at the conclusion of which the jury was asked to respond to a series of special verdicts relating to the various claims of the parties. The jury found, *inter alia*, that: (1) ARP and Amerex had the right under the 1976 Agreement to distribute videocassettes, but not (2) under the Side Agreements; (3) ARP was not entitled to any revenues in connection with licenses entered into without Marvel's consent; (4) ARP was entitled to its contractually specified share of revenues derived at any time from licensing arrangements that were consummated with Marvel's approval during the life of the 1976 Agreement; and (5) ARP was not entitled to any revenues from licenses issued after September 2, 1987.[4] The jury awarded $1,220,000 to ARP for Marvel's breach of contract by licensing others to distribute Marvel films on videocassette, and $137,000 to Marvel for various contractual breaches by plaintiffs that are not germane to this appeal.

The district court entered a judgment incorporating the jury awards of damages, requiring Marvel to pay ARP $293,480 in commissions due on one of the Side Agreements, and requiring an accounting by ARP to Marvel with respect to the 1976 Agreement and the Side Agreements. The court referred the accounting to a magistrate.

Plaintiffs thereafter sought leave to move for the recovery of costs and attorneys' fees pursuant to 17 U.S.C. § 505 (1988) and Fed.R.Civ.P. 11. The district court denied the application, noting that "neither party is the prevailing party and neither party is entitled to receive costs," and ordered plaintiffs not to submit any bill of costs.

---

3. More precisely, paragraph 8 allows termination of the *license* granted by the agreement in that event, while making specific provision for continuation of the other terms of the agreement. It is the continuation of the license, however, that is in contention, so this analytical distinction is without practical consequence.

4. The special verdicts posed to the jury, and accordingly the jury's responses thereto, were in

some respects confusing. In a subsequent memorandum and order, the district court reconciled and clarified the jury's rulings, and we accept the district court's resolution of the matter. *See Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 891 (2d Cir.1988); *Sylvestri v. Warner & Swasey Co.*, 398 F.2d 598, 603 (2d Cir.1968).

In October 1989, before the accounting had been concluded, plaintiffs appealed, and Marvel cross-appealed, to this court. We dismissed the appeal as premature, holding that because the issues pending before the magistrate went beyond mere ministerial tasks and involved issues of law that might require rulings by the district court and become the subject of a future appeal, the judgment of the district court was not a "final decision[ ]" within the meaning of 28 U.S.C. § 1291 (1988). *Arp Films, Inc. v. Marvel Entertainment Group, Inc.*, 905 F.2d 687, 689 (2d Cir.1990) (per curiam). After dismissal of the appeal, the accounting was concluded and a stipulation and order was entered reflecting its conclusions, whereupon the parties appealed and cross-appealed again.

## Discussion

We address in turn the issues raised by plaintiffs on their appeal, and by Marvel on its cross-appeal.

### A. *Plaintiffs' Appeal.*

■ Plaintiffs' main contention on appeal is that they were entitled to withhold payments and accountings from Marvel as a result of Marvel's repudiation of the 1976 Agreement by the First Termination, while at the same time collecting commissions and licensing new contracts. In essence, plaintiffs contend that withholding the payments and reports was a self-help measure designed to force Marvel to repent from its repudiation, and did not amount to a material breach. We disagree.

On the heels of Marvel's repudiation (the First Termination), ARP had two options: (1) it could have stopped performance and sued for total breach; or (2) it could have affirmed the contract by continuing to perform while suing in partial breach. *See* John D. Calamari & Joseph M. Perillo, *Contracts* § 11–18, at 458–59 (3d ed. 1987). In this case, ARP's decision to continue receiving benefits pursuant to the 1976 Agreement was tantamount to an election to affirm the contract. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 767 F.Supp. 1269, 1280 (S.D.N.Y.1991);

*North Country Rocky Point, Inc. v. Lewyt–Patchogue Co.*, 60 A.D.2d 866, 866, 401 N.Y.S.2d 258, 258–59 (2d Dep't), *appeal denied*, 44 N.Y.2d 643, 405 N.Y.S.2d 1027, 376 N.E.2d 936 (1978); *Cities Serv. Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306, 1313–14 (1976). In view of this affirmance, ARP's refusal to perform its end of the bargain, by making payments and providing reports, was impermissible. *See McDonald's Corp. v. Robert A. Makin, Inc.*, 653 F.Supp. 401, 403–04 (W.D.N.Y. 1986) (notwithstanding alleged breach by plaintiff, defendant's failure to make periodic payments constituted breach when defendant accepted benefits of contract); *Maguire v. Campagnoli & Co.*, 17 N.Y.S.2d 129, 131–32 (Sup.Ct.1939) (contrary to law and sound morals to permit party to repudiate his obligation while retaining consideration he has received).

■ Further, the district court correctly concluded that the breach by plaintiffs in failing to make the payments and provide the reports required by the 1976 Agreement was material as a matter of law, thus authorizing Marvel to terminate the contract. Paragraph 8 of the 1976 Agreement explicitly singled out plaintiffs' obligation to provide "prompt accounting" for distributions as a term and condition of the agreement, the substantial breach of which authorized Marvel to terminate the license provided by the agreement. In addition, failure to tender payment is generally deemed a material breach of a contract. *See Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1014 (D.C.Cir.1985); *Jafari v. Wally Findlay Galleries*, 741 F.Supp. 64, 67–68 (S.D.N.Y.1990); *Truglia v. KFC Corp.*, 692 F.Supp. 271, 276–77 (S.D.N.Y.1988), *aff'd mem.*, 875 F.2d 308 (2d Cir.1989). Finally, as the district court found, and the subsequent accounting confirmed, the amounts withheld from Marvel by plaintiffs were very substantial.

Plaintiffs further contend that other factual disputes regarding the meaning and performance of the 1976 Agreement should have precluded the district court's partial summary judgment that plaintiffs materially breached the agreement by withholding

required payments and reports. We are unpersuaded. None of the contentions proffered by plaintiffs bear significantly upon the core conclusion that plaintiffs were not entitled to affirm the agreement while refusing to perform, over a substantial period of time, their most important obligations to Marvel thereunder.

Plaintiffs' next claim is that certain jury instructions concerning ARP's right to videocassette distributions were improper. As indicated earlier, the jury concluded that videocassette distribution was encompassed by the 1976 Agreement, but not by the Side Agreements with ARP. Accordingly, plaintiffs' claim of error impacts only the final determination regarding the Side Agreements.

◼ Plaintiffs requested that the district court charge the jury that Marvel had the obligation expressly to exclude videocassette sales from any license agreements, invoking *Bartsch v. Metro–Goldwyn–Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir.), *cert. denied*, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968). ARP contends that *Bartsch* establishes a rule that in a licensing contract, the licensee is granted all rights not specifically reserved by the licensor. The district court declined to give the requested instruction. We agree with the district court.

Plaintiffs concede that "Arp was granted the right to distribute the additional films by short letters stating no terms for distribution." In *Bartsch*, on the other hand, we addressed the issue whether "an assignee of motion picture rights to a musical play [was] entitled to authorize the telecasting of its copyrighted film" when the assignment had been made in 1930 and authorized the licensee "to copyright, vend, license and exhibit ... motion picture photoplays throughout the world." 391 F.2d at 151. We concluded that, absent any surviving witnesses who might cast light on the original intentions of the parties, "it seem[ed] fairer that the burden of framing and negotiating an exception [to the grant] should fall on the grantor." 391 F.2d at 155. We cannot see any basis for applying that rule to the Side Agreements, which

included no grant language comparable to that construed in *Bartsch*.

◼ Plaintiffs also contend that the district court, in applying the special verdicts, improperly awarded Marvel all fees collected on licenses that ARP sold after November 12, 1986. The jury had answered in the negative the following interrogatory: "Has ARP proven, by a preponderance of the evidence, that it is entitled to any monies in connection with licenses it entered into without Marvel's consent?" It is undisputed that the 1976 Agreement required that all licenses be submitted to Marvel for approval, and that Marvel withheld its consent to any new licenses after the First Termination on November 12, 1986. Further, the district court noted that "Arp might have argued, and demonstrated with evidence, that it was unreasonable [for Marvel] to withhold its approval of any or all of the pre-September 1987 proposed deals but Arp did not do so." On this state of the record, no error occurred in disallowing any share for ARP of the revenues generated by the licenses ARP granted, without authorization, after the First Termination.

◼ Plaintiffs further claim that the district court committed error by refusing to allow expert testimony on the practice of "barter syndication" for purposes of the damage calculation. They point out that the 1976 Agreement called upon the parties to maximize the income resulting from licenses granted thereunder, contend that barter syndication would have accomplished this goal, and further claim that there was an adequate basis in the record for the proffered expert testimony.

In barter syndication, television stations are licensed to exhibit films and pay for the license with advertising time instead of cash, which the licensor then resells. The expert's calculation of the value to ARP of such syndication, for the time frame between the First and Second Terminations, exceeded three million dollars. ARP argues that the exclusion of this testimony entitles it to a new trial on damages.

It is settled, however, that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); *see also Fernandez v. Chios Shipping Co.*, 542 F.2d 145, 153 (2d Cir.1976). The district court excluded this testimony on the grounds that it was speculative, that any probative value was outweighed by the danger of unfair prejudice and confusion of the issues, and that the witness was not expert as to barter syndication. The record supports the district court's exercise of discretion in so ruling.

■ Finally, the district court did not err in denying costs and attorneys' fees to plaintiffs. The decision to award costs is committed to the sound discretion of the district court, and is accordingly reviewed for abuse of discretion. *Lerman v. Flynt Distrib. Co.*, 789 F.2d 164, 166 (2d Cir.), *cert. denied*, 479 U.S. 932, 107 S.Ct. 404, 93 L.Ed.2d 357 (1986). The same rule applies to statutory costs and attorneys' fees pursuant to 17 U.S.C. § 505 (1988). *See Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766–67 (2d Cir.1991); *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 78 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). In view of the mixed outcome of this litigation, the district court was well within its discretion in concluding that plaintiffs were not prevailing parties within the meaning of section 505 or Fed.R.Civ.P. 54(d), and accordingly were not entitled to costs or attorneys' fees.

### B. *Marvel's Cross–Appeal.*

On cross-appeal, Marvel argues that it is entitled to an order overturning the judgment of the district court in several respects because that judgment was premised upon insupportable jury rulings. Marvel claims that the jury's answers to three interrogatories are not supported by evidence and are therefore the result of confusion and speculation. The three challenged jury findings are that: (1) the license pro-vided by the 1976 Agreement included videocassettes; (2) ARP was entitled to deferred commissions on a Side Agreement involving a syndicated Spiderman series; and (3) ARP was entitled to its contractual share of revenues generated after the Second Termination from proper licensing activity completed prior thereto.

■ The reversal of jury verdicts is not favored by the law. We will do so only when, viewing the matter in the light most favorable to the party for whom the jury found, the evidence permits only one reasonable conclusion. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1045 (2d Cir. 1989); *Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 507–08 (2d Cir. 1989). We find no basis for such action in this case.

■ The evidence at trial, while not uncontested, in no way foreclosed the challenged jury determinations. There was ample evidence from which the jury could infer that the license provided by the 1976 Agreement included videocassettes. The jury was entitled to conclude that deferred commissions were payable upon Marvel's termination of the Side Agreement regarding the syndicated Spiderman series. Finally, we perceive no basis to deny ARP its contractual share of revenues under the 1976 Agreement for revenues generated, after the Second Termination, by valid and authorized licenses. We note in this regard that paragraph 8 of the 1976 Agreement, while authorizing the parties to terminate the *license* provided by that agreement in certain situations, specified that "except for such termination of license, this agreement shall continue in full force and effect."

### Conclusion

The orders and judgment of the district court are affirmed in all respects.