**DUNKIN' DONUTS INCORPORATED,**
**Plaintiff/Counter–Defendant,**

v.

**Trpko TASESKI, Bosko Taseski, and TRBO Corporation, Defendants/Counter–Plaintiffs.**

No. Civ.A. 97–40411.

United States District Court,
E.D. Michigan,
Southern Division.

April 26, 1999.

Steven A. Browne, Robert L. Zisk, Schmeltzer, Aptaker & Shepard, Elizabeth Jolliffe Basten, Clark Hill, Detroit, MI, for Dunkin' Donuts, Incorporated, plaintiff.

Kurt R. Thornbladh, Farmington, MI, James T. DeVidts, Evangelista & DeVidts, Warren, MI, for Trpko Taseki, defendant.

Kurt R. Thornbladh, Farmington, MI, James T. DeVidts, Evangelista & DeVidts, Warren, MI, for Bosko Taseki, defendant.

Kurt R. Thornbladh, Farmington, MI, James T. DeVidts, Evangelista & DeVidts, Warren, MI, for Trbo Corporation, defendant.

Kurt R. Thornbladh, Farmington, MI, James T. DeVidts, Evangelista & DeVidts, Warren, MI, for Trpko Taseki, counter-claimant.

Kurt R. Thornbladh, Farmington, MI, James T. DeVidts, Evangelista & DeVidts, Warren, MI, for Bosko Taseki, counter-claimant.

Kurt R. Thornbladh, Farmington, MI, James T. DeVidts, Evangelista & DeVidts, Warren, MI, for Trbo Corporation, counter-claimant.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF/COUNTER–DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

This is a case involving the turbulent relationship between a franchisor, plain-

tiff/counter-defendant Dunkin' Donuts Incorporated (hereinafter plaintiff "Dunkin' Donuts"), and its franchisees, defendants/counter-plaintiffs Trpko Taseski, Bosko Taseski, and TRBO Corporation (hereinafter "defendants"). Presently before the Court is plaintiff's motion for summary judgment on all remaining counts in its first amended complaint and on defendants' counterclaims, filed February 25, 1999. At the outset, it is important to note that the parties have stipulated to defendants' liability for breach of contract relating to defendants' intentional underreporting of sales, underpayment of fees, falsification of financial reports, and violation of applicable laws. See joint stipulation and consent judgment entered February 10, 1999. The only remaining issues concern the amount of damages incurred by plaintiff as a result of defendants' breach, as well as any other applicable remedies, and three counterclaims brought by defendants against Dunkin' Donuts. On March 17, 1999, defendants filed their response to plaintiff's motion. A reply brief was filed on April 8, 1999.

For the reasons set forth below, the Court will grant plaintiff's motion for summary judgment.

## I. Factual Background

### A. The Franchise Agreement

Defendants Trpko Taseski, Bosko Taseski, and TRBO Corporation are owners and operators of a Dunkin' Donuts franchise located at 37310 South Gratiot Avenue, Mt. Clemens, Michigan pursuant to a franchise agreement entered into on July 5, 1993. In exchange for the right to use Dunkin' Donuts's proprietary marks and the "Dunkin' Donuts System," defendants agreed to pay to plaintiff corporation a franchise fee of 4.9% and an advertising fee of 6% of the sales earned by their franchise. Defendants also agreed to accurately report their sales to the plaintiff on a weekly basis and pay the fees due on those sales at that time.

In addition to the franchise agreement, the parties also executed a lease option agreement dated October 10, 1993 relating to the Dunkin' Donuts franchise. Under the terms of the lease option agreement, Dunkin' Donuts would have 30 days after the termination of defendants' franchise agreement to notify Trpko and Bosko Taseski that it wished to exercise its rights under the lease option agreement. If plaintiff exercised its rights, then defendants agreed that they would then execute and deliver a lease for the premises to plaintiff along with possession of the premises.

In 1997, plaintiff began surveillance of defendants' franchise and uncovered the fact that defendants were making substantial wholesale deliveries. Based on this fact and other evidence of underreporting of sales, on September 13, 1997, plaintiff sent a notice of default and termination to defendants, terminating their franchise agreement. On October 7, 1998, plaintiff sent a notice of election under the lease option agreement to defendants Trpko and Bosko Taseski. To the present date, defendants have not executed a new lease with plaintiff corporation nor have they surrendered possession of their franchise pursuant to the lease option agreement.

As previously mentioned, the parties filed a joint stipulation and consent judgment as to liability on February 10, 1999. In that submission, defendants admitted to breaching the franchise agreement with plaintiff by intentionally underreporting the gross sales earned, by falsifying documents, and by intentionally underpaying their franchise fees and advertising fees to plaintiff. The parties also stipulated that defendants breached the franchise agreement by failing to comply with applicable laws relating to the operation of the Dunkin' Donuts franchise. Defendants also withdrew their demand for trial by jury.

### B. The issue of damages and the Quick Retail Sales Analysis (QRSA) program

In light of the February 10, 1999 joint stipulation and consent judgment as to lia-

bility, the only remaining issue contained within plaintiff's complaint is the issue of damages incurred by plaintiff as a result of defendants' breach. In an attempt to calculate these damages, plaintiff has performed an analysis of defendants' franchise. This analysis was accomplished via a computer program, Quick Retail Sales Analysis (QRSA), which uses records of a franchisee's purchases of raw ingredients to calculate the amount of actual historical sales as compared with reported sales.[1]

According to plaintiff, the QRSA program calculated that defendants' actual historical sales were $4,308.08 *more* per week than the sales defendants had reported to plaintiff corporation. Based on this calculated weekly variance over a three year period from June 1994 through May 1997, plaintiff maintains that defendants owe it the sum of $73,254.59 in unpaid franchise and advertising fees based on a percentage of the unreported sales. In addition to this amount, plaintiff further alleges that defendants owe expenses relating to the investigation for underreporting and interest, all of which defendants are required to pay under the franchise agreement in the event they are found to have underreported sales. As a consequence, plaintiff contends that the total amount owed to plaintiff by defendants is $97,652.45.

## C. Defendants' counterclaims

There are three counterclaims remaining against plaintiff, to wit: Counterclaim II, "Breach of Franchise Agreement—Wrongful Collection of Franchise and Advertising Fees on Additional Products," Counterclaim IV, "Wrongful Refusal to Approve Transfer of Defendants/Counter-Plaintiffs' Franchise," and Counterclaim V, "Breach of Implied Covenant of Good Faith and Fair Dealing."[2]

Counterclaim II is premised upon a rider to the franchise agreement stating that defendants need not pay franchise or advertising fees on "additional products." Such products are defined as convenience store products that are "not the same or substantially similar to any product sold in typical Dunkin' Donuts shops...." See Rider, attached as Exh. 1A to plaintiff's motion for summary judgment, ¶ 2. The "additional products" upon which defendants base their claim that plaintiff wrongfully collected fees consist of items which were contained in a refrigerator or cooler located in the store. The items include juices, milk, and Lipton Ice Tea, but no food products. See Trpko Taseski Depo., attached as Exh. 3B to plaintiff's motion for summary judgment, pp. 63–64, 71–72.

According to plaintiff, other Dunkin' Donuts franchisees do typically sell milk, juice, and soft drinks and are required to report and pay fees on those sales. *See* Exh. 1 to plaintiff's motion for summary judgment, ¶ 14. Plaintiff also points out that defendant Trpko Taseski admitted during his deposition on October 6, 1998 that other Dunkin' Donuts shops sell soft drinks such as milk, juice or soda. *See* Trpko Taseski Depo., attached as Exh. 3B to plaintiff's motion for summary judgment, p. 61. Moreover, plaintiff emphasizes that defendant Trpko Taseski testified that he always voluntarily reported and paid fees on these "additional products" and that he never complained to any employee of plaintiff corporation about such payments. *See id.*, p. 70.

1. Plaintiff argues that defendants have attempted to use the Fifth Amendment privilege against self-incrimination to prevent discovery regarding the amount of underreporting and therefore should be estopped from submitting evidence on the issue. This argument will be addressed in the analysis section of the instant memorandum opinion.

2. By stipulation of the parties, the Court dismissed Counts I and III of defendants' first amended counter-complaint. See joint stipulation and consent judgment entered February 10, 1999. Count I was entitled "Dunkin's Breach of Franchise Agreement" and Count III was entitled "Wrongful Exercise of Lease Option Rights." *See* defendants' answer, affirmative defenses and first amended counter-complaint filed Nov. 9, 1998.

Counterclaims IV and V allege that Dunkin' Donuts wrongfully refused to approve a proposed transfer of defendants' franchise agreement to a third-party. However, plaintiff points out that the proposed transfer was submitted for plaintiff's approval *only after* plaintiff had sent the notice of default and termination of defendants' franchise agreement.

## II. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). In evaluating a motion for summary judgment, the Court must view the evidence in a light most favorable to the nonmovant, as well as draw all reasonable inferences in the nonmovant's favor. *See U.S. v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts

showing a genuine triable issue. Fed. R.Civ.Proc. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*,

> [t]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

## III. Analysis

There are several issues which remain following the parties' stipulation as to liability on February 10, 1999. These include (1) plaintiff's motion for summary judgment with respect to an award of damages based upon the calculations performed by the QRSA program; (2) plaintiff's motion for summary judgment on all remaining counterclaims brought by defendants, i.e., on Counterclaims II, IV, and V; (3) plaintiff's request for an order enforcing the termination of the parties' franchise agreement; (4) plaintiff's request for an order requiring defendants to comply with the terms of the lease option agreement; and (5) plaintiff's request to hold defendants liable for reasonable attorneys' fees and expenses incurred in enforcing the termination. Each of these issues shall be addressed hereinbelow *seriatim*.

### A. Plaintiff is entitled to summary judgment on its claim for damages against defendants.

Plaintiff argues that it is entitled as a matter of law to an award of damages in the amount of $97,652.45. As previously discussed, this amount was calculated using the QRSA computer program. Plaintiff further maintains that defendants should be barred from presenting any evidence on the issue of damages at trial since defendant Trpko Taseski in his deposition refused to answer any questions regarding the amount of defendants' reporting or the amount of unreported wholesale sales. Plaintiff points to deposition testimony of Trpko Taskei in which he repeatedly refused to answer any questions regarding the amount of his underreported sales to plaintiff or the amount of restitution owed by defendants to plaintiff. The following exchanges are illustrative of defendant's refusal to answer premised on his exercise of the Fifth Amendment privilege against self-incrimination:

Q: Was the amount that you intentionally underreported your sales to Dunkin' Donuts in excess of $4,300 a week?

\* \* \* \* \* \*

A: I take the Fifth.

Trpko Taseski Depo., attached as Exh. 3B to plaintiff's motion for summary judgment, pp. 113–14.

Q: [D]id you say that Dunkin' said you owed them $3,000, or is that what you think you owe them?

A: That's what I think.

Q: Why do you think you owe them that much?

\* \* \* \* \* \*

A: I'll take the Fifth.

*Id.* at 82–83.

Q: How much unreported wholesale business did you do, Mr. Taseski?

A: Take the Fifth.

\* \* \* \* \* \*

Q: But Mr. Taseski, are you refusing to answer any questions about either the wholesale business that you have done, or records pertaining to wholesale business?

A: Correct.

*Id.* at 158–60.

■ The issue presented is whether a civil litigant who raises the Fifth Amendment privilege against self-incrimination during discovery may be barred from presenting evidence on that issue during trial and/or in response to a motion for summary judgment. According to plaintiff, defendants have prevented discovery on the issue of the total amount of sales under reported to Dunkin' Donuts and therefore should be precluded from offering any evidence in opposition to plaintiff's damages calculation.

In response, defendants argue that there is a policy against granting a "default judgment" simply because defendant claimed a personal privilege on one issue. According to defendants, despite "relentless" questioning during the deposition, Trpko Taskei "remained firm that he intended to take personal privilege only as to the fraud count." *See* Trpko Taseski Depo., attached as Exh. 3B to plaintiff's motion for summary judgment, p. 160; *see also Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967).

Plaintiff directs the Court to several cases holding that once a civil litigant invokes his Fifth Amendment privilege on an issue, he will be barred thereafter from introducing other evidence on that issue. *See Traficant v. Commissioner of I.R.S.*, 884 F.2d 258, 265 (6th Cir.1989); *In re Edmond*, 934 F.2d 1304, 1308–09 (4th Cir. 1991); *U.S. v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir.1990); *Pedrina v. Han Kuk Chun*, 906 F.Supp. 1377, 1398 (D.Haw. 1995), *aff'd*, 97 F.3d 1296 (9th Cir.1996), *cert. denied*, 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997); *U.S. v. Island Park*, 888 F.Supp. 419, 431–32 (E.D.N.Y. 1995); *U.S. v. All Assets & Equip. of West Side Bldg. Corp.*, 843 F.Supp. 377, 382–83

(N.D.Ill.1993), *aff'd,* 58 F.3d 1181 (7th Cir. 1995). Federal courts find such a preclusive effect grounded in the following reasoning:

> [a] defendant may not use the fifth amendment to shield herself from the opposition's inquiries during discovery only to impale her accusers with surprise testimony at trial.
>
> \*　\*　\*　\*　\*　\*
>
> Because claimant has asserted a fifth amendment claim in discovery, this court holds that he may not now waive the privilege and testify. Neither may he submit affidavits in opposition to the government's motion for summary judgment.

*U.S. v. Sixty Thousand Dollars in U.S. Currency,* 763 F.Supp. 909, 914 (E.D.Mich. 1991) (Gadola, J.).

In *Traficant,* a taxpayer appealed a United States Tax Court decision imposing a penalty for fraud due to the taxpayer's alleged failure to report bribes as income. 884 F.2d at 260. The Sixth Circuit held that "it was proper under principles of reciprocity for the Tax Court to bar Traficant, once he had invoked the privilege against self-incrimination on the authentic-

ity of the statement and the tapes, from introducing other evidence on that matter." *Id.* at 265. The court further held that "[s]uch limits are properly within the scope of cases holding that a party to civil litigation or other non-criminal proceedings may encounter costs imposed in exchange for the assertion of the Fifth Amendment privilege as long as they are not so high as to force abandonment of the privilege." *Id.* (citing *Spevack v. Klein,* 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967) and *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)).

Because of the potential expansiveness of such a rule of preclusion, the Sixth Circuit in *Traficant* was careful to note that "when the issue is whether a court may impose broad limits on the admissibility of evidence, the cases permit only limits *directly related* to the scope of the asserted privilege." *Id.* (citing *Securities and Exchange Commission v. Cymaticolor,* 106 F.R.D. 545 (S.D.N.Y.1985) and *In re Anthracite Coal Antitrust Litigation,* 82 F.R.D. 364 (M.D.Pa.1979)) (emphasis added).[3]

In the instant case, the parties have already stipulated to the fact that defen-

---

**3.** The general rule articulated in *Traficant* is also regularly applied in the summary judgment context. *See, e.g., In re Edmond,* 934 F.2d 1304, 1308–09 (4th Cir.1991) (holding that debtor's refusal to submit to a deposition, based upon assertion of privilege against self-incrimination, justified bankruptcy judge's decision to strike the debtor's affidavit in support of his motion for summary judgment); *U.S. v. Parcels of Land,* 903 F.2d 36, 43 (1st Cir.1990) (holding that district court had ample authority to strike claimant's affidavit offered in opposition to government's motion for summary judgment in forfeiture action after claimant invoked Fifth Amendment and refused to answer government's deposition questions); *Pedrina v. Han Kuk Chun,* 906 F.Supp. 1377, 1398 (D.Haw.1995), *aff'd,* 97 F.3d 1296 (9th Cir.1996), *cert. denied,* 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997) (holding that party may not rely on its own testimony or affidavits to support its version of disputed fact issue in connection with summary judgment motion where party has asserted Fifth Amendment right not to answer

questions concerning that very issue); *U.S. v. Island Park,* 888 F.Supp. 419, 431–32 (E.D.N.Y.1995) (holding that because of potential for abuse of privilege against self-incrimination by defendants who use it to obstruct discovery only to waive it and subject the plaintiff to surprise testimony at trial, courts recognize appropriateness of imposing sanctions for civil defendant's assertion of the privilege during discovery; decision to assert privilege during pretrial depositions may be valid grounds for precluding defendant from testifying at trial, as well as for striking affidavits opposing summary judgment motions); *U.S. v. All Assets & Equip. of West Side Bldg. Corp.,* 843 F.Supp. 377, 382–83 (N.D.Ill. 1993), *aff'd,* 58 F.3d 1181 (7th Cir.1995) (holding that district court need not consider evidence claimant presented to show that property subject to forfeiture proceedings was not acquired with proceeds of claimant's husband's drug trafficking activity, where claimant refused, on Fifth Amendment grounds, to answer government's deposition questions concerning same topics).

dants did underreport sales, but defendants refused to answer any questions on *the amount* underreported. Defendants argue that Trpko Taseski was claiming the Fifth Amendment privilege *only* as to the fraud count. However, this allegation is not supported by the record. Page 160 of the Trpko Taseski Deposition, upon which defendants rely, *does not support the argument* that Taseski's exercise of the privilege was limited to the fraud count. That page merely shows that defendants have turned over at least some records to plaintiff which Mr. Taseski refused to answer questions about or to identify.

Furthermore, defendants' reliance on *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), is misplaced. In *Spevack*, an attorney had previously been ordered disbarred due to his refusal to produce financial records and to testify at a judicial inquiry. He based his refusal on the Fifth Amendment privilege against self-incrimination. The Supreme Court held that invocation of the privilege, in and of itself, does not warrant the harsh penalty of disbarment. *Id.* at 516, 87 S.Ct. 625.[4]

*Spevack* is distinguishable from the case at bar because in the instant case defendants have already stipulated to liability for damages incurred. Moreover, precluding defendants from introducing evidence on the issue of damages after their refusal ·to answer questions on the subject is not tantamount to the harsh penalty of disbarment. Such an evidentiary sanction is consistent with the case law cited above and, in the words of the Sixth Circuit in *Traficant*, "not so high as to force abandonment of the privilege." 884 F.2d at 265. Accordingly, the Court will not allow defendants, at this stage after invoking the privilege against self-incrimination and refusing to answer questions on the matter, to introduce testimony or other evidence in

support of their version of the damages amount.

The Court, having established that defendants are not in any position to contest the validity of plaintiff's damages calculation, must now apply Federal Rule 56 to determine whether plaintiff, as movant, has met its burden of demonstrating the absence of a genuine issue of material fact as to the damages amount. Plaintiff has satisfied its initial burden by producing the results of the QRSA calculation. The burden is thus shifted to defendants to set forth specific facts showing a genuine triable issue. *See* Fed.R.Civ.Proc. 56(e); *Gregg*, 801 F.2d at 861. Defendants, however, are unable to satisfy this shifted burden because, as discussed, they are precluded from offering evidence on the topic of damages due to their invocation of the Fifth Amendment privilege.

In light of the above, defendants having failed to satisfy their shifted burden of establishing a genuine triable issue of material fact as to the amount of damages owed, this Court is left with no other option other than to adopt plaintiff's calculation of damages. Judgment shall be entered consistent with the amount calculated by plaintiff.

**B. Plaintiff is entitled to summary judgment on Counterclaims II, IV, and V.**

In Counterclaim II, defendants allege that plaintiff has breached the franchise agreement by accepting defendants' payments of franchise and advertising fees for "additional products." Defendants rely upon a rider to the franchise agreement providing that franchisees are not required to pay fees on such "additional products."

Plaintiff argues that the rider defines "additional products" as convenience store products which are "not the same or substantially similar to any product sold in

---

4. As the Supreme Court stated, "[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are powerful forms of compulsion to make a lawyer relinquish the privilege." *Spevack*, 385 U.S. at 516, 87 S.Ct. 625 (citing *United States v. White*, 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542).

typical Dunkin' Donuts shops...." *See* Rider, attached as Exh. 1A to plaintiff's motion for summary judgment, ¶ 2. Plaintiff has produced affidavit testimony of Jack Laudermilk, plaintiff's legal counsel and assistant secretary, in which he states that "Dunkin' Donuts franchisees typically sell, and are required to report and pay fees on sales of, soft drinks such as milk, juice, and soda." Laudermilk Certif., attached as Exh 1 to plaintiff's motion, ¶ 13. Moreover, plaintiff points to defendant Trpko Taseski's deposition where he admitted that other Dunkin' Donuts shops do sell soft drinks such as milk, juice or soda. *See* Trpko Taseski Depo., attached as Exh. 3B to plaintiff's motion, p. 61.

Defendants' only response to plaintiff's argument regarding the inapplicability of the rider are these two brief sentences: "Plaintiff's cases are inappositive. The controlling principle of law is that money paid under a mistake of fact can be recouped in an action assumpsit." However, defendants' claim of a "mistake of fact" is unsupported by the record. To the contrary, the facts presented confirm that *no* mistake was made because defendants' were correct in voluntarily paying fees on the sales of such products. There is therefore no ground for an action of assumpsit which lies "where money has been received which in equity and good conscience ought to be refunded." *See* BLACK'S LAW DICT. 122 (6th ed.1990).

The Court need not reach plaintiff's additional argument that by voluntarily paying such fees without complaint defendants thereby waived any claim for breach of contract based on those payments. *See Bissell v. L.W. Edison Co.*, 9 Mich.App. 276, 156 N.W.2d 623, 628 (1967). The Court finds that plaintiff has satisfied its burden of showing that there exists no

genuine issue of material fact as to Counterclaim II alleging that plaintiff has breached the franchise agreement by accepting defendants' payments of franchise and advertising fees for any so-called "additional products." Accordingly, plaintiff's motion for summary judgment on this counterclaim shall be granted.

Counterclaim IV alleges breach of contract premised on plaintiff's refusal to allow defendants to transfer the franchise. Plaintiff argues that the "franchise" that defendants attempted to transfer consisted of nothing more than whatever rights and obligations defendants had at that time under the franchise agreement. Upon discovering defendants' underreporting scheme, however, plaintiff served defendants with a notice of termination at which time defendants' rights under the franchise agreement were extinguished. It is undisputed that plaintiff had terminated the franchise agreement long before defendants had submitted the purported transfer to plaintiff for its approval.[5]

At that point in time when defendants attempted to transfer the franchise, in May of 1998, the Court finds that defendants had "no right to continue operating the franchise or to transfer it for value." *Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.*, 100 N.J. 166, 495 A.2d 66, 72 (1985); *see also KFC Corp. v. Goldey*, 714 F.Supp. 264, 266 (W.D.Ky. 1989) (holding that franchisee is barred from selling a terminated franchise agreement). Moreover, the Court finds that defendants' own prior breach of contract provides an additional reason to bar their claims for breach of contract against plaintiff. *See Aetna Casualty Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1569 (1st Cir.1994) (holding that a fundamental

---

5. Defendants allege that on May 5, 1998 counter-plaintiff TRBO and (potential) purchasers executed a purchase agreement for sale and purchase of TRBO's franchise, subject to the approval of plaintiff Dunkin' Donuts. *See* Anser, Affirmative Defenses and Counter-Complaint, ¶ 33. However, previ-

ously on September 13, 1997, plaintiff sent a notice of default and termination to defendants, terminating their franchise agreement. It is apparent from this sequence of events, and given defendants' *admitted* scheme of underreporting, that defendants had no "franchise" to transfer in May of 1998.

breach bars assertion of any further rights under the contract by the party guilty of the breach).

■ Defendants rely upon the Michigan Franchise Investor Law, Mich.Comp.Laws § 445.1501 *et seq.*, in an attempt to bolster their argument that plaintiff committed a breach of contract by refusing to allow the proposed transfer. *See* Mich.Comp.Laws § 445.1527(g).[6] However, this Michigan statute is inapplicable under the facts of the instant case. Paragraph 16A of the franchise agreement clearly states that "[t]his Agreement shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts." *See* Exh. 1.A. to plaintiff's motion, ¶ 16A. Such choice of law clauses are generally valid and enforceable. *See Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 360 (6th Cir.1993) (holding that litigating franchise dispute in Michigan does not require that Michigan law govern dispute as Michigan Franchise Investment Law does not expressly void choice of law provisions in franchise agreement). As a result, Michigan law would not be applicable. *Even if* Michigan law were to apply, plaintiff Dunkin' Donuts' refusal to approve the transfer is not premised on the allegedly unenforceable clause in paragraph 10B giving plaintiff veto power but rather upon the fact that defendants' rights under the franchise agreement had *already terminated* and thus defendants had nothing to transfer.[7]

Accordingly, summary judgment will be granted in plaintiff's favor on Counter-

claim IV alleging breach of contract for plaintiff's refusal to allow the proposed transfer.

■ With respect to the related Counterclaim V, alleging that plaintiff breached the implied covenant of good faith and fair dealing by refusing to sanction the transfer, this claim must fail as well. Defendants have not put forth any evidence that plaintiff engaged in any behavior that would constitute a breach of the implied covenant of good faith and fair dealing, i.e., conduct evincing "an aspect of fraud, deceit, or misrepresentation." *A. John Cohen Ins. Agency, Inc. v. Middlesex Ins. Co.*, 8 Mass.App.Ct. 178, 392 N.E.2d 862, 864 (1979). As plaintiff points out, it simply did not allow a purported transfer of an already validly terminated franchise agreement. Plaintiff was certainly within its rights to refuse to allow the transfer in May 1998, after defendants themselves had materially breached the agreement and after the agreement itself had been terminated.

Accordingly, this Court will grant plaintiff's motion for summary judgment on Counterclaim V alleging breach of the implied covenant of good faith and fair dealing.

### C. Plaintiff's request for an order enforcing the termination of the parties' franchise agreement shall be granted.

■ As an additional remedy, plaintiff requests an order enforcing the termi-

---

6. Mich.Comp.Laws § 445.1527 provides, in pertinent part,

   that the following provision[ ] is void and unenforceable if contained in any documents relating to a franchise: ... A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause. This subdivision does not prevent a franchisor from exercising a right of first refusal to purchase the franchise.

   M.C.L. § 445.1527(g).

7. Defendants in their response brief also suggest that plaintiff failed to give defendants an adequate opportunity to cure and are liable

for tortious interference of business expectancy. Defendants' cure argument is belied by the franchise agreement itself, which clearly provides in paragraph 9.B.4. as follows: "No cure period shall be available if franchisee ... intentionally underreports gross sales or falsifies financial data...." *See* Exh. 1A to plaintiff's motion. Moreover, as discussed above, given the prior notification that the franchise agreement had been terminated due to defendants' breach, defendants could not realistically have had any valid business expectancy with regard to any purported transfer of the franchise.

nation of the parties' franchise agreement. Defendants have stipulated that they intentionally underreported gross sales, intentionally underpaid their obligations, and falsified financial records. The parties agreed in the franchise agreement that this kind of conduct constitutes grounds for termination *without* the opportunity for cure. *See* Franchise Agreement ¶ 9B4. Plaintiff moves this Court for an order giving effect to the parties' contractual choice of remedies for such intentional underreporting.

The Court finds that plaintiff is entitled to an order enforcing the termination of the parties' franchise agreement. This finding is supported by the cases cited by plaintiff. *See ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 649 (2d Cir.1991) (holding that failure to pay obligations under a contract is a material breach as a matter of law when parties explicitly state in the contract that failure to pay warrants termination); *The Southland Corp. v. Mir*, 748 F.Supp. 969, 983–84 (E.D.N.Y.1990) (holding that franchisee's scheme to underreport "went to the root of the matter or the essence of the contract"). Furthermore, defendants clearly have committed other terminable offenses by violating applicable laws, as they have already admitted in the joint stipulation and consent judgment filed entered February 10, 1999, in the operation of their franchise. *See In re Matthews Enters., Inc.* 51 B.R. 333, 336 (Bankr.S.D.Ind.1985) (holding that failure to pay sales taxes is a breach of trust); *Dunkin' Donuts, Inc. v. Panagakos*, Bus. Franchise Guide (CCH) ¶ 11,174 (D.Mass. May 13, 1997) (holding that franchisee's tax evasion scheme provided cause for termination); *Dunkin' Donuts, Inc. v. Chetminal, Inc.*, Bus. Franchise Guide (CCH) ¶ 11,290 (S.D.Fla. Oct. 30, 1997) (holding that franchisee's illegal sale of cigarettes to minors provided cause for termination).

■ Defendants argue that the Michigan Franchise Investor Law protects them from termination of the franchise agreement. *See* M.C.L. § 445.1527(c). However, as mentioned above, the parties have agreed to a valid choice of law clause which provides that Massachusetts law is to govern. *See Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 360 (6th Cir.1993). *Even if* Michigan law were to be applied, it still would not serve to protect defendants in light of their *admitted* intentional underreporting of sales, underpayment of fees, falsification of financial reports, and violation of applicable laws. Section 445.1527(c) states that the following is void and unenforceable if found in a franchise agreement: "[a] provision that permits a franchisor to terminate a franchise prior to the expiration of its term except for good cause." M.C.L. § 445.1527(c). "Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than 30 days, to cure such failure." *Id.*

In the instant case, defendants argue that they have "cured" their breaches by "amending the tax returns." While this may amount to a cure with respect to defendants' falsification of financial reports, it certainly does not amount to a cure with regard to defendants' other breaches. Plaintiff certainly had good cause for terminating the franchise agreement due to defendants' other breaches and these have not yet been cured. *See Two Men and a Truck/International Inc. v. Two Men and a Truck/Kalamazoo, Inc.*, 955 F.Supp. 784 (W.D.Mich.1997) (holding that under Michigan Franchise Investment Law, franchisees' failure to comply with lawful provisions in franchise agreements by failing to pay royalties and advertising fees and failing to file monthly sales reports constituted "good cause" for franchisor's termination of agreements, where franchisor gave notice of termination in writing and franchisees made no effort to cure).

Plaintiff's request for an order enforcing the termination of the parties' franchise agreement will therefore be granted.

### D. Plaintiff's request for an order requiring defendants to comply with the terms of the lease option agreement shall be granted.

■ Plaintiff further requests an order requiring defendants to comply with the terms of the lease option agreement. It is undisputed that the parties entered into a valid lease option agreement which provides that plaintiff would have the opportunity to preserve the premises as a Dunkin' Donuts shop should the franchise agreement be terminated. *See* lease option agreement, attached as Exh. 1.B, ¶ 1. The lease option agreement provides that plaintiff has 30 days after defendants receive notice of termination of the franchise agreement to elect to enter into a new lease with defendants. *Id.* ¶ 2. Defendants then agreed that they would execute a new lease with plaintiff in the form attached to the lease option agreement and surrender possession of the premises to plaintiff. *Id.* It is undisputed that plaintiff gave defendants the requisite notice of election under the lease option agreement on October 7, 1997, within 30 days following notice of termination dated September 13, 1997. *See* Exh. 1.F. To date, defendants have failed to execute a new lease with plaintiff nor have they surrendered the premises.

In light of the above, the Court will grant plaintiff's request for an order requiring defendants to comply with the terms of the lease option agreement. Specific performance is appropriate under the facts presented in the instant case, especially due to defendants' failure to abide by their promise to lease the shop to plaintiff upon termination of the franchise agreement. Plaintiff has persuasively argued that an inability to preserve the goodwill already accumulated at the location would result in irreparable harm to plaintiff corporation. *See Jiffy Lube Int'l Inc. v. Weiss Bros., Inc.*, 834 F.Supp. 683, 691 (D.N.J.1993) (holding that franchisor not only has valid interest in protecting good will it has developed, "but it also has an interest in being able to place a new franchisee at or near the same location where its goodwill has been created"); *Dunkin' Donuts, Inc. v. Dowco, Inc.*, Bus. Franchise Guide (CCH) ¶ 11,374 (N.D.N.Y. March 31, 1998) (ordering specific performance of lease option agreement after termination of franchise); *Rita's Water Ice Franchise Corp. v. DBI Invest. Corp.*, Bus. Franchise Guide (CCH) ¶ 10,918 (E.D.Pa. Apr. 9, 1996) (holding that franchisor "has an interest in the goodwill its franchise has created").

### E. Plaintiff's request for reasonable attorneys' fees and expenses incurred in enforcing the termination shall be granted.

Lastly, plaintiff maintains it is entitled to reasonable attorneys' fees and expenses incurred in enforcing the termination. The franchise agreement explicitly provides that "if this Agreement is terminated, [defendants] shall pay to [plaintiff] all damages, costs, and expenses ... and reasonable attorneys' fees, incurred by [plaintiff] as a result of any such default or termination." *See* franchise agreement, ¶¶ 9C2 and 9F1, Exh. 1.A. Contractual provisions for payment of reasonable attorneys' fees are generally valid under Michigan law and under Massachusetts law which the parties agreed would govern any disputes under the contract. *See Sentry Ins. A Mutual Co. v. Lardner Elevator Co.*, 153 Mich.App. 317, 395 N.W.2d 31, 35 (1986); *see also Lincoln Street Realty Co. v. Green*, 374 Mass. 630, 373 N.E.2d 1172, 1173 (1978); *Kucel v. Walter E. Heller Co.*, 813 F.2d 67, 73 (5th Cir.1987).

In their brief in response, defendants appear not to contest the underlying validity of the contractual provision in the franchise agreement providing for payment of reasonable attorneys' fees and expenses. Defendants, however, question both the amount of the proposed reasonable attor-

neys fees (approximately $100,000) as well as plaintiff's decision to hire out-of-state counsel. In view of these concerns, the Court will allow defendants an opportunity to file objections following plaintiff's submission of a bill of costs, attorneys' fees and expenses. The Court will then consider both parties' respective filings to determine the appropriate amount of reasonable attorneys' fees and other expenses incurred by plaintiff in enforcing the termination.

## ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED that plaintiff/counter-defendant Dunkin' Donuts Incorporated's motion for summary judgment is **GRANTED;**

**IT IS FURTHER ORDERED** that the franchise agreement between the parties dated July 5, 1993 is terminated;

**IT IS FURTHER ORDERED** that defendants/counter-plaintiffs Trpko Taseski, Bosko Taseski, and TRBO Corporation shall comply with the terms of the lease option agreement dated October 10, 1993 *within 30 days* of this order;

**IT IS FURTHER ORDERED** that defendants/counter-plaintiffs Trpko Taseski, Bosko Taseski, and TRBO Corporation shall pay to plaintiff/counter-defendant Dunkin' Donuts Incorporated the sum of $97,652.45 *forthwith;*

**IT IS FURTHER ORDERED** that plaintiff shall file *within 10 days* a bill of costs, attorneys' fees and expenses for this Court's review and consideration; defendants may submit objections *within 10 days* following the filing of said bill of costs.

**IT IS FURTHER ORDERED** that all remaining claims and counterclaims in the above-entitled case are **DISMISSED WITH PREJUDICE;** and

**IT IS FURTHER ORDERED** that defendants/counter-plaintiffs shall pay to plaintiff/counter-defendant post-judgment interest pursuant to 28 U.S.C. § 1961; a judgment in accordance with this order shall be entered forthwith.

## SO ORDERED.

### *JUDGMENT*

The Court, having granted plaintiff/counter-defendant Dunkin' Donuts Incorporated's motion for summary judgment, after a hearing conducted April 21, 1999, the Honorable Paul V. Gadola, District Judge, presiding,

It is hereby **ORDERED, ADJUDGED and DECREED** that all remaining claims and counterclaims in the above-entitled action be **DISMISSED** with prejudice;

It is further **ORDERED, ADJUDGED and DECREED** that judgment be entered in favor of plaintiff/counter-defendant Dunkin' Donuts Incorporated in the amount of $97,652.45 and against defendants/counter-plaintiffs Trpko Taseski, Bosko Taseski, and TRBO Corporation;

It is further **ORDERED, ADJUDGED and DECREED** that the franchise agreement between the parties dated July 5, 1993 is terminated;

It is further **ORDERED, ADJUDGED and DECREED** that defendants/counter-plaintiffs Trpko Taseski, Bosko Taseski, and TRBO Corporation shall comply with the terms of the lease option agreement dated October 10, 1993 *within 30 days;*

It is further **ORDERED, ADJUDGED and DECREED** that defendants/counter-plaintiffs shall be liable for plaintiff/counter-defendant's reasonable costs, attorneys' fees and expenses in the amount to be determined by the Court;